Franklin L. HANEY

v.

The UNITED STATES.

No. 571–77.

United States Court of Claims.

March 10, 1982.

Glower W. Jones, Atlanta, Ga., attorney of record, for plaintiff. Smith, Currier & Hancock and Frank E. Riggs, Jr., Atlanta, Ga., of counsel.

William Douglas White, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Anthony Borwick, Washington, D. C., General Services Administration, of counsel.

Before COWEN, Senior Judge, NICHOLS and KASHIWA, Judges.

## OPINION

PER CURIAM:

This case comes before the court on both plaintiff's and defendant's exceptions to the recommended decision of Trial Judge Francis C. Browne, filed December 31, 1980, pursuant to Rule 134(h). The claim as upheld by Trial Judge Browne is for breach of a "build and lease" contract. Oral argument has been heard in this matter and the court has also considered the written exceptions and briefs in support thereof, submitted by the parties. Since the court agrees with the recommended decision of the trial judge,* as hereafter set forth, it affirms and adopts that decision together with the following supplemental paragraphs, as the basis for its judgment.

■ 1. With regard to plaintiff's extra work claim, specifically the supplemental refreshment areas, we add the following to the trial judge's discussion (which, as stated above, we adopt): the government reserved the right to designate "the location of the refreshment areas." It is undisputed that plaintiff intended and its contract price was based upon the vertical stacking of the supplemental refreshment areas. The parties agree that the government reserved the right to designate the location of the supplemental refreshment areas. The parties fail to agree, however, as to the scope of the power reserved.

Trial Judge Browne held that by exercising its right under the power reserved in the contract, the government did so "in a manner contrary to sound architectural engineering design." The corollary of this holding is that plaintiff was reasonable under the applicable architectural and engineering principles in thinking the areas would be stacked. At least nowhere is it disputed that plaintiff's version is not reasonable.

We think that in addition to the fact that plaintiff's interpretation is a reasonable one under the circumstances, the doctrine of *contra proferentem* supports the trial judge's decision.

It is uncontroverted that the General Services Administration (GSA) prepared the amended contract documents in which the relevant reservation of power appears. The clause "to designate the 'location of the supplemental refreshment areas'" can be read in at least two plausible ways. The first, and the government's position, is that this allows the government to designate where *each* supplemental refreshment area is to be located without regard to the location of any other. The second, and plaintiff's interpretation, only allows the government to specify where on a typical floor the refreshment area is to be located, that is a singular location with other floors to correspond, or as plaintiff admits, the government may have retained the right to relocate the refreshment areas from the fourth and seventh floors to the third and sixth floors of the building. Thus, it can be seen that considerable latent ambiguity is present in the terms of the contract provision, hence the dispute. We think plaintiff

---

* The court also adopts the trial judge's separate findings of fact as its own, which are set forth in his recommended decision and are not printed here. Facts necessary to the decision are contained in his opinion.

reasonably read it to refer only to designations conforming to normal industry practice.

It is elementary that ambiguities in a written contract are construed against the party or parties who prepared the contract, if the other party reasonably construed them otherwise. *Thompson Ramo Wooldridge, Inc. v. United States*, 175 Ct.Cl. 527, 361 F.2d 222 (1966). Applying this doctrine to the foregoing facts serves only to bolster the conclusion reached by the trial judge and his recommended decision is therefore affirmed.

2. Plaintiff contends that Trial Judge Browne erred when he failed to include in his findings of fact or in his conclusions of law, a finding of bad faith requested by plaintiff regarding the government's actions. Plaintiff's proposed finding 113 states in relevant part:

> * * * Giving consideration to that data [plaintiff's 26-page claim presentation and a 4-volume appendix of exhibits] and the voluminous documentation submitted to the Government throughout the job, and especially the Government file documents indicating some responsibility for certain of the claims items causing a delay for which the Government was responsible (such as the stop order claim) * * *, the Government acted in bad faith in not timely rendering affirmative relief to the schedule of the Contractor by not granting a time extension while the work was in progress and by [not] making a reasonable determination of the added costs for which the Government was responsible.

The crux of plaintiff's contention is that the failure of the government to administratively address the merits of its numerous claims, and then asserting a counterclaim for liquidated damages, entitles him to a finding of bad faith. This is particularly appropriate, plaintiff argues, where, as here, some of the government's internal memoranda admit responsibility for some of the delay and where the contracting officer denied all of plaintiff's claims substantially on the ground that inadequate information was available to support the claims. Most, if not all, of the documents and exhibits submitted in support of the administrative claims have been entered and made part of the record in this proceeding. Thus, plaintiff wants this court to enter a finding of bad faith with regard either to the contracting officer's denial of the administrative claims or to the assertion of government counsel for liquidated damages or to both in combination.

Trial Judge Browne found that the contracting officer, in making his decision, noted that Mr. Theodore Sachs, the former GSA contracting officer who had been responsible for the actions which gave rise to plaintiff's claim, had retired and was then employed by Haney. The decision stated that Mr. Sachs' testimony on plaintiff's claims was not made available.

Trial Judge Browne did not discuss the question of bad faith on the part of the government in his opinion. Plaintiff's exception here deals with an alleged failure on Trial Judge Browne's part to find bad faith on the basis of the undisputed facts as described above. The trial judge's failure to find bad faith must be read as a denial of plaintiff's requested finding.

We do not agree with plaintiff that the record herein supports a finding of bad faith. In *Kalvar Corporation, Inc. v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977), we pointed out that "[a]ny analysis of a question of Governmental bad faith must begin with the presumption that public officials act 'conscientiously in the discharge of their duties'" (quoting from *Librach v. United States*, 147 Ct.Cl. 605, 612 (1959)). A finding of bad faith requires "well-nigh irrefragable proof" in order for the court to abandon the presumption of good faith dealing. *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954). The necessary and almost irrefutable proof has been equated with evidence of a *"specific intent to injure the plaintiff." Kalvar v. United States*, 211 Ct.Cl. at 198–99, 543 F.2d at 1302 (emphasis in original). In the

context of a pre-Wunderlich Act contract making a board decision final, this court has implied bad faith from a grossly erroneous decision. *Levering & Garrigues Co. v. United States*, 71 Ct.Cl. 739 (1931). The difference in context must be noted and we cannot draw that kind of inference here.

Merely because this court and the contracting officer reach different results in the same case, does not, without more, establish that the contracting officer acted in bad faith. It is worth noting that the record before the contracting officer and the one before us are, taken as a whole, different records. In the proceeding before the court, we have, for example, the benefit of expert and other testimony, and of cross-examination of witnesses. The contracting officer in making his or her decision did not, and does not, as a general rule, share in these benefits. In addition, the trial judge had an opportunity to observe all the witnesses and to weigh their testimony. The trial judge's failure to enter a finding of bad faith is presumptively based on this fact finding opportunity and to this extent is entitled to finality.

The contracting officer's decision is at the very least rationally supported by the fact that the testimony of Theodore Sachs was not made available. Sachs was the former contracting officer responsible for much of the project and at the time plaintiff's claims were denied was also in plaintiff's employ. In view of the strong presumption in the contracting officer's favor it would not be unduly speculative to say that Mr. Sachs' testimony could be especially relevant where, as in our case, there are internal memoranda which admit liability for some of the delays in the project. None of the parties shed any light on Mr. Sachs' relation to the facts in this litigation. It is, however, plaintiff's burden to overcome the presumption and his failure to advance any explanation or any evidence on the point is fatal to this effort. The fact that the contracting officer denied plaintiff's claims on the ground of inadequate information does not in the circumstances of this case constitute the "well-nigh irrefragable proof" required to induce the court to abandon the presumption of good faith dealing.

With respect to defendant's counterclaim for liquidated damages, plaintiff fares no better. Defendant's counterclaim for liquidated damages was based on its position that plaintiff was responsible for the delays in the project. As one among many possible examples of colorable claims advanced to show plaintiff's delay, the government argued that plaintiff's failure to have preliminary mechanical plans drafted by the engineer(s) of record gave the government the right to reject the preliminary submittals as unsatisfactory. Although it lost on this point, as shown below in the trial judge's opinion, defendant, by making this argument, presented a colorable claim for delay in view of the contract requirement that "[a]ll drawings shall bear the stamp and signature of the architect and engineers."

In *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir. 1977), the court stated: "[a]n action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons. Otherwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court." Applying this rule to the facts before us, we cannot say that the mere assertion of a counterclaim for liquidated damages is entirely without color or for an improper purpose. Indeed, in view of counsel's obligation to represent his client competently and vigorously, counsel may well be remiss in fulfilling this obligation by failing to assert such a counterclaim where the contract provides for liquidated damages for delay.

Finally, plaintiff cites *Levering & Garrigues Co. v. United States, supra,* in support of his position that he is entitled to a finding of bad faith. We think the willingness therein to infer bad faith from gross error is inseparable from the use by defendant of clauses for finality of administrative decisions. The concept of implying bad

faith from an error of sufficient grossness is now embodied in the Wunderlich Act, 41 U.S.C. § 321 and the Contract Disputes Act of 1978, 41 U.S.C. § 609(b). We do not think it is the appropriate standard where, as here, no such finality is claimed.

The trial judge concluded that the defendant's officials administering this contract displayed incompetence at their tasks. Plaintiff could have inquired into their capabilities before it bid. It seems fair to say that, confronted with issues the officials did not fully understand, they declined to decide them adversely to the government. That is the kind of impasse this court is for. They left everything for us. Deplorable as this may be, it is not fairly to be characterized as bad faith. There can be no doubt that an incompetent contracting and procurement official is just as likely to enhance a contractor's costs and deny for some time adjustments to which it is entitled, as he is to deplete the public fisc with reckless expenditure. The remedy is not to apply to the offenders a pejorative which we have carefully limited to offenses of a different kind. Defendant surmises that the purpose plaintiff seeks is to support a claim for counsel fees under 28 U.S.C. § 2412, *as amended.* We do not pass on this in any way except so far as our refusal to find bad faith may become law of the case.

We therefore deny plaintiff's request to enlarge the conclusions of law to reflect a finding of any bad faith on the part of defendant.

## OPINION OF TRIAL JUDGE

BROWNE, Trial Judge: This action was brought by plaintiff, Franklin L. Haney (Haney), against defendant, the United States of America (the Government), for damages resulting from breach of a contract between the parties. Pursuant to his contractual obligations and agreements with his general contractor and subcontractors, Haney asserts claims on his own behalf, as well as on behalf of his general contractor and subcontractors.

The Government has filed a counterclaim for the recovery of liquidated damages as provided for in the contract for late performance by Haney.

Haney's claims for recovery stem from two independent sources: (1) acts or omissions by the Government which resulted in a delay in the completion of the project, and (2) Government insistence that certain work be performed in excess of the contract requirements. These two different types of claims will be discussed separately below.

Determination of the amount of recovery has been reserved for further proceedings, if necessary, under Rule 131(c).

### The Contract

On March 5, 1972, the General Services Administration (GSA), Region 4, Atlanta, Georgia, issued a solicitation for offers (the solicitation) for the lease of 450,000 net usable square feet of office, warehouse, and related space in the Birmingham, Alabama area. The space was to be used by the Social Security Administration (SSA) as the "Birmingham Social Security Payment Center." The solicitation was amended numerous times; the seventh and final amendment was dated July 19, 1972.

The initial term of the lease was to be for 20 years with an option for two renewals of 10 years each. The solicitation also provided that the Government would have the option, exercisable at any time, to acquire up to 150,000 net usable square feet of additional contiguous space. While the solicitation did not expressly preclude the possibility that a potential lessor might have an existing facility which would meet the Government's requirements, it clearly contemplated that the lessor would probably have to construct a building from scratch.

Haney, a developer, retained the firm of John H. Summer and Associates (Summer) as architects to assist him in putting together his response to the solicitation and his bid for the lease contract. One of Summer's employees, Peter Hanf, acted as principal architect and drew concept sketches for a

building which would be newly constructed if the contract were to be awarded.[1]

The primary purpose of the concept sketches in the present case was to show the Government's contract negotiation team the offeror's idea for the building and that, if awarded the contract, he intended to construct a building which would meet the requirements set forth in the solicitation. The concept sketches were not intended to be firm and final drawings, but rather the first step in the evolutionary process of arriving at the final design for and engineering details of the building. The concept sketches prepared by Mr. Hanf were submitted to GSA in June 1972 as part of Haney's response to the solicitation.

After receipt of solicitation responses from several parties, the GSA contract negotiation team held individual meetings with each party who responded. During the course of negotiations with Haney, the concept sketches which he had submitted were revised to reflect the desires of GSA. By letter of August 7, 1972, Haney represented to the Government that any discrepancy between the concept sketches and the solicitation would be corrected in the final design and that the final design was to be approved by the Government before work could proceed.

On September 11, 1972, Haney entered into a formal contract with the United States of America, by and through the General Services Administration, for the leasing to defendant of an office building to be built by Haney. The contract was entitled, "U. S. GOVERNMENT LEASE FOR REAL PROPERTY." The contract incorporated the terms of the solicitation, as amended, as well as other written representations which Haney had made.

The contract documents were prepared by GSA; in particular by the branch which was responsible for acquiring space by lease. This branch was not experienced in the construction of Government buildings nor in the type of arrangement under which the Government had contracted with Haney.

After construction of the building had commenced, GSA exercised its option for additional space by requiring three additional floors totaling 150,000 square feet to be included in the contract. The exercise of the option, by itself, caused no problems for Haney, since he had already planned to construct sufficient space to cover both the amount required by the original solicitation and the amount which the Government could add to the requirement by exercising its option. In fact, the Government's exercise of the option reduced Haney's risk that he would have some vacant space in the building for a period of time.

Under the terms of the contract, the building was to be ready for occupancy by the SSA no later than August 1, 1974. The contract clearly shows, and the parties agree, that time was of the essence. Defendant not only had the duty to cooperate with plaintiff and not interfere with the normal construction progress and sequencing of the work, but the contract even provided that no change orders would be requested by the Government which would delay the occupancy date.

Haney entered into a contract with Martin & Nettrour Contracting Company (M & N or the general contractor) as the general contractor for the design and construction of the building. M & N, as general contractor for the project, entered into various subcontracts for performance of the construction and design work. Summer was selected as the architectural firm and Peter Hanf was the principal architect for the project. American Bridge Division of the United States Steel Corporation (Ambridge) was chosen as the subcontractor for the structural steel portion of the project. Ball-Co Contractors, Inc. (Ball-Co), as the mechanical contractor for the project, was

---

1. Concept sketches are relatively simple, small-scale, single-line drawings which indicate the basic shape of a building, its location on a plot of ground, the nature of the parking area, the permanent partitions within the building, and a typical floor plan. Concept sketches are primarily architectural renditions and do not involve the detailed engineering aspects of the construction project which are considered at a later time.

responsible for the heating, ventilating, air-conditioning, and plumbing systems, among other items of work of a mechanical nature. Crawford Interiors, Inc. (Crawford) was given the subcontract for furnishing and installation of carpet. Dixie Construction Co., Inc. (Dixie) was the subcontractor for the masonry work. Fischbach & Moore, Inc. (F & M) was chosen as the subcontractor for the electrical equipment and installation of the electrical systems for the project. Hartline-Thomas (Hartline) was the painting subcontractor.

## DELAY CLAIMS

### Structural Steel Delay

The concept sketches which Haney had submitted with his response to the solicitation included layout arrangements for the first and second floors of the building. Those two floors were to be used for substantially different functions than floors three and above, the latter being designated for use as general office space.

As originally submitted, the preliminary design provided that all partitions or walls in the basement and on floors one and two were to be permanent partitions, *i.e.*, masonry (concrete block) walls. In addition, the walls around the mechanical equipment rooms, vending rooms, and supplemental refreshment areas were to be permanent masonry partitions. The partitions on the upper floors were to be of lighter materials. Because of their weight, the masonry walls on each of the first two floors (but not those in the basement) had to be supported by steel beams. Accordingly, the location of each and every masonry wall on each of the lower floors had to be established before the structural steel to support those floors and the upper floors could be designed and ordered.

The contract provided that preliminary documents [2] were to be submitted to GSA for approval within 70 days after award. The documents were to be submitted so

that GSA could determine if they complied with the solicitation. Thus, the preliminary documents were due to be submitted to GSA by November 22, 1972. Haney's preliminary documents were submitted to GSA on that date. Paragraph 1.15.3 of the contract provided that: "Preliminary documents will be reviewed by the Government and will be returned to the successful Offeror within 30 calendar days of their being received by the Government." Thus the defendant was to return the preliminary documents by December 22, 1972. Final design documents were to be submitted within 70 days after Government approval of the preliminary documents.

After the contract had been entered into but prior to the date set for submission of the preliminary documents, at the behest of GSA and based upon discussions with GSA personnel, on October 5, 1972 plaintiff submitted for GSA's review concept sketches with revised first floor, second floor, and computer room layout arrangements, including revised locations of the masonry walls. Thus, Haney anticipated that the preliminary documents which were to be submitted to GSA by November 22, 1972, would be acceptable to GSA, as revised on October 5, 1972.

After the drawings were submitted to GSA by the plaintiff on November 22, 1972, GSA marked a number of changes on the preliminary architectural drawings. The changes included further rearrangement of interior partitions for the basement, first, and second floors of the building. These were not included in the October 5, 1972 revisions and, in some cases, added work which was not even required by the contract. In other cases, changes were indicated because GSA claimed that the drawings, as submitted, did not meet the contract requirements.

Many of the provisions of the formal contract were "boiler plate" clauses ordinarily used in contracts for construction of buildings to be owned by the Government.

---

**2.** The preliminary documents included preliminary working scale drawings (which were more numerous and detailed than the concept sketches) and preliminary calculations for heating, air conditioning, plumbing, and electrical systems.

Paragraph 1.15.1 of the contract was such a clause. It provided, in pertinent part, as follows:

1.15.1 Registered Architect-Engineer

All construction shall be designed by a registered architect and structural engineer. All mechanical and electrical work shall be designed by registered mechanical and electrical engineers. * * * All drawings shall bear the stamp and signature of the architect and engineers.

The registered architect shall be responsible for the drawings and specification, and the structural, mechanical, and electrical engineers shall be members of the architect's firm or shall be under direct contract to him for this project. The registered architect shall be responsible for review, coordination and approval of all shop drawings, materials and samples submitted for or to the contractor. * * * Immediately upon Notification of Acceptance of Offer, the Lessor shall select a registered architect-engineer of his choice and submit to the Contracting Officer the names of the architect and engineers he proposes to use on the project with evidence outlining their experience in the type and size of construction proposed.

In compliance with the notification provisions of paragraph 1.15.1, Haney, by letter of October 11, 1972, confirmed that Summer would be the registered architect, that Siffri-Knowlton (S–K) would be the structural engineer, and that Blakely-Ward-Stucky & Associates (BWS) (formerly Blakely-Daniels & Associates) would be the mechanical and electrical engineers. Those were the same entities which had been identified in Haney's response to the solicitation.

The basic engineering work and calculations for the preliminary documents were performed by employees of the structural, mechanical, and electrical subcontractors. These employees were not members of the Summer, S–K, or BWS firms or under direct contract to any of them for the project. The firm of Blakely-Ward-Stuckey, itself, did not prepare the mechanical and electrical submittals, but it did review, take responsibility for, and approve the submittals prepared by the employees of the respective mechanical and electrical contractors.

The General Services Administration objected to the submittals on various grounds and considered them to be "completely unacceptable" primarily on the ground that the preparation of those submittals by engineers not employed by, or directly under contract with, the designated engineering firms was not in compliance with the express terms of paragraph 1.15.1 of the contract.

The dispute regarding the qualification of the authors of the preliminary documents was finally resolved to GSA's satisfaction by having S–K and BWS, the engineers of record, confirm in writing by letter dated January 5, 1973, that they were assuming full responsibility for the preliminary documents prepared by the employees of the respective subcontractors. (GSA had been previously informed of the facts contained in the January 5 letter.) To the extent that the preliminary documents were defective as to authorship, GSA waived the defect by accepting the letter of January 5, 1973, in satisfaction of the contract requirements.

Prior to January 5, 1973, the General Services Administration, by letter of December 13, 1972, had returned a copy of the structural, mechanical, and electrical portions of the preliminary documents (but not the architectural drawings) and rejected all of them (except the architectural drawings) for the various reasons stated in that letter, in addition to the question regarding their authorship. GSA deemed the objectionable portions of the preliminary submittals "completely unacceptable" and directed Haney to resubmit the structural, mechanical, and electrical portions of the preliminary documents in conformance with the contract requirements as interpreted by GSA in the comments listed in its December 13, 1972 letter.

Eight days later, by letter of December 21, 1972, Haney responded to the objections which GSA had made regarding the mechanical portion of the preliminary documents. This letter obviated many of GSA's

objections, but not all of the objections were remedied to GSA's satisfaction by Haney's response. None of the items to which GSA made objection substantially affected the structural steel requirements.

In its review of the preliminary mechanical documents which had been prepared by an employee of Ball-Co, BWS objected to certain things which they contended were required to be changed in order to make the preliminary mechanical documents fully comply with the contract requirements. However, BWS did not deem the documents as being "completely unacceptable." GSA acted unreasonably in completely rejecting these documents rather than approving them subject to correction of the minor faults which were found, particularly in light of the strict time constraints on the project.

Because of the coordination necessary between the structural, mechanical, electrical, and architectural drawings, GSA felt that it was necessary to know how the rejected submittals were to be revised before the architectural drawings could be properly reviewed and approved. Therefore, by letter of December 22, 1972, GSA returned Haney's preliminary architectural documents and rejected them also. Plaintiff received the letter on December 26, 1972.

The architectural documents, when returned to Haney, contained on them written notes and criticisms made by GSA personnel who reviewed them. Haney was directed to revise the architectural drawings as indicated and resubmit them as soon as possible. If all preliminary documents had been approved by GSA as of this date, the original schedule for submission and approval of all preliminary documents would have been met.

Haney's architect met with GSA representatives on January 2, 1973, to review the markings made by GSA on the preliminary architectural drawings. On January 5, 1973 (the same date on which S–K and BWS certified the authorship of the preliminary documents), Haney's architect resubmitted to GSA the preliminary architectural drawings in the revised form and content which GSA had requested.

Many of the changes which were made by GSA on the interior wall layout arrangement pertained to permanent wall locations on the basement, first, and second floors which were required to be of masonry partitions and which, consequently, required structural steel support. These revisions required the structural steel design to be changed and not only caused delay in placing the order for the structural steel, but also was a cause for delay in completion of the building and delivery for occupancy by August 1, 1974.

Structural steel was the most critical material that was needed to be ordered to keep the progress of the project on schedule inasmuch as construction of the superstructure could not proceed until the structural steel framework was erected. A lead time of several weeks was required to allow scheduling of production, fabrication, and delivery of the structural steel elements and the order could not even be placed until the locations of each of the permanent partitions in the building were known.

In late February 1973, Haney's architect received from GSA a revised computer room design which again affected the location of masonry partition walls for that area of the second floor of the building. At a meeting on February 23, 1973, Haney's architect was shown revised layouts for masonry wall partitions for the first and second floors by the GSA architect, but a copy of the revised plan was not furnished to Haney's architect at that time. However, at the GSA architect's request, Haney's architect added the revisions to his own copy of the architectural drawings. GSA advised Haney's architect that it contemplated even further changes but that those changes had not yet been definitized. These developments prevented Haney from finalizing the structural steel requirements and design.

The contract provided that the kitchen was to be located on the first floor of the building adjacent to the cafeteria. The Government was to furnish the equipment and layout for the kitchen-cafeteria area.

That layout was to be furnished to Haney when the preliminary documents were returned to him.

As early as January 1973, plaintiff had advised the Government that the failure of GSA to locate the permanent masonry partitions was delaying the project. The Atlanta GSA office had expected the Washington GSA office to prepare the kitchen-cafeteria layouts for the project. The Washington office did not prepare the kitchen-cafeteria layout, so the GSA authorities in Atlanta directed the Atlanta GSA office to prepare the kitchen-cafeteria design layout with such information as it had available and furnish it to Haney. Although the drawings were to have been submitted to Haney at the time of return of the preliminary documents on December 22, 1972, the drawings were not supplied to Haney until March 8, 1973.

The kitchen-cafeteria layout drawing from GSA was the last information needed by Haney and his contractors to be able to place the order for the structural steel. The receipt of that information actually triggered the ordering of the structural steel for the project, even though the complete set of preliminary architectural drawings was still being revised by GSA and had not yet been fully approved.

The kitchen-cafeteria layout actually furnished by the Government did not provide complete information, working drawings, nor detailed measurements. To determine the permanent wall locations, it took an additional day to ascertain the measurements from the preliminary drawings. Haney's architect promptly relayed the information set forth in the Government-furnished kitchen layout to Ambridge and the structural steel order was placed on March 9, 1973. However, it was not until March 14, 1973, that GSA finally issued written approval of the revised preliminary architectural documents. (These 5 days did not add to the project delay.)

The layout of the permanent interior partitions for the basement, first, and second floors shown in the first preliminary document submittal (November 22, 1972) con-formed with Haney's revised concept sketches and were consistent with discussions that had been intermittently held between Haney's architect and GSA staff since June 1972. Nevertheless, Haney made the changes requested by GSA. Upon approval "As Noted" of the second submittal of the preliminary architectural drawings (submitted January 5, 1973), GSA again changed the same interior masonry partitions from the locations shown on the second preliminary architectural drawings. Most of these "new" locations essentially were the same or similar to the locations of those masonry walls which had been depicted on the first preliminary architectural drawings which had been submitted November 22, 1972. This shows that GSA recognized that the preliminary architectural drawings originally submitted on November 22, 1972, complied with the requirements of the contract and should have been approved as submitted.

One reason why the interior masonry partition layout information was not furnished to plaintiff at an earlier date was that the Atlanta GSA office did not have needed information from, or the approval of, SSA and other Government offices whose input was needed before the plans could be finalized. This information was initially delayed because the SSA objected to the floor size shown by the floor plan layout as first submitted. SSA contended that additional square footage area for each floor was to be provided and that, until it was provided, there was no need to review the layouts because they were not of the required size. GSA overruled that contention and agreed that the floor size proposed by Haney was correct. However, the resolution of that difference extended over a number of weeks during which no action was taken by GSA or SSA to draft the interior layout information and furnish it to Haney. This internal Government dispute which contributed to the delay in getting approved drawings to Haney contributed to the delay in completion of the overall project and delivery of the building for occupancy as scheduled.

Ambridge was not able to proceed with the scheduling of its manufacture and fabrication of the structural steel elements until March 9, 1973, the date when the entire structural steel order had been released. Ambridge had expected approval of the design drawings sufficient to commence work on December 22, 1972. In the meantime, Ambridge accepted orders from other customers, making it more difficult to schedule work for Haney. Although partial releases of the order to proceed with the structural steel shop drawings had been provided for floors three through nine on January 25, 1973, and for floors nine through eleven on January 26, 1973, the release of the order to start on those floors did not significantly contribute to any job progress because the specifications for and manufacture of the steel for the lower floors had to be coordinated by Ambridge with the specifications for and manufacture of the steel for the upper floors.

On March 21, 1973, Haney submitted a revised completion schedule to GSA, adding 3 months to the overall construction time due to the structural steel delays. GSA refused to admit that it was responsible for that delay but deferred making a decision on whether or not it would allow a time extension or a change in the schedule of delivery of the building for occupancy because of that delay. Haney made efforts to expedite the work and to attempt to make up for the earlier Government-caused delays by expediting delivery of structural steel, by working overtime, by taking work out of sequence, and by taking other steps to mitigate the effect of the delay, all at the expense of Haney or his contractor or subcontractors.

Under the original plan and contractual commitment of Ambridge, it was to complete the manufacture and erection of the structural steel in 5½ months. The original plan, based on placement of the order in December 1972, called for field erection of the structural steel to commence approximately June 15, 1973, and completion in September 1973. The actual erection did not start until August 27, 1973, but ended by December 1973. Thus, while the start of

the structural steel erection work was delayed, once it was under way it was completed within the total time period originally anticipated. Neither Haney, Ambridge, nor any other contractor was responsible for the delay in the ordering of and the ultimate erection of the structural steel. The delay was attributable solely to the Government's failure to finally and timely establish its requirements for the location of the permanent partitions on the first and second floors, as a consequence of which the entire structural steel program was delayed.

The delay in the structural steel program imposed extra costs on Haney and his contractors. In order to mitigate the effect of the Government's delay, M & N paid extra transportation costs to expedite delivery of the structural steel; however, the delay had already pushed the erection of the structural steel into the fall and winter months of 1973–74 when wet and muddy conditions surrounded the site. Had the structural steel been completed approximately 3 months earlier as originally scheduled, the wet and muddy conditions would not have interfered with the further work of the project.

The fact that the order to Ambridge was delayed until March 9, 1973, also pushed the shop and field work of Ambridge into periods of higher labor rates. The further revisions of the preliminary architectural drawings made by GSA when it returned the drawings in March 1973, also created additional expenses for Ambridge in reengineering and redrawing those parts affected by the changes. Those GSA revisions required the addition of 5 days to the original schedule for field erection.

The permanent masonry interior partition layouts for the basement, first, and second floors, as shown on the architectural preliminary drawings submitted November 22, 1972, adequately conformed with the solicitation requirements; the GSA changes to those layout arrangements were not made merely for the purpose of bringing the plans into conformity with the solicitation,

but instead were elective changes not provided for by the contract. Consequently, the Government is responsible for all damages caused by its frequent changes to the design and unreasonable delay in giving Haney's preliminary documents final approval.

### The CPM Schedule

The normal construction procedure as anticipated by Haney was to start the construction, then finish work from the bottom up in accordance with a "critical path method" (CPM) of construction. The Government welcomed Haney's use of CPM as a planning and management tool.[3] Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

Haney's original CPM schedule set completion of the basement and floors one through eight for July 10, 1974, and completion of all remaining work, including floors nine through eleven, by August 20, 1974. The base schedule was realistic and the work could have been performed in accordance with that schedule had it not been for the Government-caused delays.

The CPM schedule reflected information furnished by the subcontractors which indicated how long the work should take. During the construction, the CPM was monitored by field reports submitted to the home office and by inspections of a field engineer. Computerized revisions of the CPM were made periodically to reflect the work progress and to administer and properly schedule the continuing activities. The CPM schedule was revised when the structural steel delay occurred. Thereafter, the CPM was used in scheduling further work, until the GSA change orders made this impractical.

Haney's CPM technical staff and expert, who were familiar with the construction project during the time of the work and who had prepared or assisted in the preparation of the CPM schedule that was used for the project, prepared a technical analysis using the base CPM schedule. That analysis shows that the impact of the delaying events extended the time for performance of the job from August 20, 1974 to June 6, 1975.

At trial, plaintiff presented expert testimony which established, by CPM analysis, the cumulative effect of each delay that occurred on the project. While the Government would not agree to the conclusions reached by plaintiff's expert (because it denied liability for various delaying events), the Government agreed during the trial that the CPM *methodology* used by plaintiff was correct and acceptable, and that the events described would cause a delay to the critical path of the project as demonstrated by Haney's CPM analysis.

The CPM analysis of delay presented on behalf of plaintiff took into account, and gave appropriate credit for all of the delays which were alleged to have occurred, including the results of plaintiff's acceleration by expediting equipment and materials, working out-of-sequence, weather delays, and the strike by the operating engi-

---

**3.** The original solicitation contained a very detailed requirement that the offeror use the critical path method in planning all work, and that frequent submittals of revised CPM schedules be made to the Government. This provision was deleted in Addendum I to the solicitation and replaced by a simple requirement for status reports and progress charts.

neers. (Haney did not seek compensation for the latter event.)

*Interior Partition Delay*

During a meeting on August 28, 1973, GSA placed a "hold" on the plans for the kitchen-cafeteria (first-floor) and the computer room (second floor), because further changes were contemplated for those areas. (*See* p. 598, *infra.*) These "hold" orders had the same effect as a "stop order." They effectively brought to a halt the work on the first two floors of the building.

In order to proceed with the overall project while the hold orders continued to cause delay on the lower floors, Haney deviated from the CPM schedule and excluded the lower three floors (basement, first, and second) from the normal and planned work sequence and concentrated on such work as could be done on floors three and above, such as interior partitioning and electrical work.

The contract provided that the Government was to furnish interior partition (non-permanent) layout drawings to plaintiff 120 days after approval of final design documents. Since the final architectural drawings which were submitted by Haney's architect on June 22, 1973, were approved by GSA on July 24, 1973, the date by which GSA was to submit interior partition layout information was November 21, 1973.

The Social Security Administration was responsible for preparing the interior partition layout drawings and the desk arrangement drawings. It was to furnish that information to GSA which, in turn, was to furnish the design layout information to Haney. On November 14, 1973, Haney warned GSA that a delay in furnishing the layout drawings could stop orderly progress and cause additional delay on the project. That same day representatives of the SSA were, for the first time, apprised by GSA of the fact that the layout information was needed from them and that the deadline for submission of drawings to Haney was November 21, 1973.

The partition layout drawings were not actually furnished to Haney until January 21, 1974, two months late. Even then they were not in adequate form for construction purposes. Haney had to prepare engineering drawings from the inadequate GSA drawings before the interior work could be performed. The late submission of the drawings by GSA to Haney caused a delay in the progress of the work for which the Government was solely responsible. This included the delay in completion of the electrical work and installation of the floors and floor coverings.

GSA was also late in furnishing Haney with the exact locations of the telephone and electrical outlets. Even when this information was furnished to Haney on January 21, 1974, it was not the final layout. GSA made numerous changes in the outlet locations subsequent to this date. The failure of GSA to timely furnish and maintain the exact location of the outlets caused delays and resulted in additional costs to Haney, his contractor and subcontractors.

After completion of field working drawings for the interior finish, the construction work proceeded with a substantial amount of work being done, such as placement of receptacle outlets into the floors by "coring." On April 9, 1974, GSA issued a stop order which instructed Haney to stop work by the electrical subcontractor on the electrical and telephone outlets on all floors because further modifications of the layout were going to be made by GSA and would be furnished to Haney sometime in the future. On the same date, GSA issued another stop order instructing Haney to cease installing partitions on the tenth and eleventh floors because modifications to the layout were being made by GSA and were to be furnished to Haney at a later time. Haney caused the work to be stopped, as directed by GSA. This interfered with the normal progress of work and caused delay in completion of the work on all floors above the second floor. It also resulted in additional costs to Haney, his contractor and subcontractors.

The standard "suspension of the work" clause frequently found in standard

Government construction contracts was not made a part of this contract. There was no provision in the contract which would permit GSA to order a stop on the work for any cause. In fact, there was an affirmative requirement that *no* change orders would be issued which would *delay performance* by Haney, or *delivery* of the building for occupancy by August 1, 1974. Plaintiff timely protested that the stop order was improper and that GSA should be held accountable for the damages caused by the resulting delay. GSA, however, refused to compensate Haney for the damage suffered as a consequence of the delays caused solely by GSA.

The construction work directly affected by the stop orders, including floor outlets and partitioning, was the subject of still further changes made by GSA; subsequently, GSA rescinded the stop orders to allow work to proceed on the basis of the further changes. At least three sets of changes or revisions to the locations of the floor outlets were made between May 24 and October 1, 1974. As a result of the changes directed by GSA, many core drillings previously made in the floor for planned outlets had to be abandoned and were not used but instead were covered over prior to installation of the floor carpeting.

The GSA stop order also impacted upon the carpeting installation at the project. Carpeting had been delivered to the site in April 1974, and Crawford, the subcontractor, was ready to install it upon delivery. Since GSA had issued its stop order the day before the carpeting installation was to commence and further changes were made after the stop order was rescinded, it was not until June that Crawford could proceed with the laying of the carpeting. The stop order, therefore, imposed extra costs upon Haney and his subcontractors in regard to the installation of carpeting.

After the various stop orders had been put into effect, timely performance of the remainder of the work (such as installation of partitions) became so confused that orderly performance became impossible and the subcontractors worked wherever work could proceed, without regard to orderly sequence or efficiency. This delay resulted in a reduction of available manpower because not enough work was available to keep the manpower up to the level at which it had been at the time the stop orders were issued. Since the stop orders significantly delayed the work and prolonged the overall completion of the job and delivery of the premises for occupancy, issuance of the stop order was a breach by GSA of the express contractual prohibition against such delays. *See George A. Fuller Co. v. United States,* 105 Ct.Cl. 248, 279, 63 F.Supp. 765, 768 (1946).

On October 21, 1974, GSA accepted Haney's change order proposals for revision of the locations of floor outlets for power and telephone service. Those proposals included a revised and extended completion date for this work to May 15, 1975.

The Government denies that the acceptance of this change order allowed an extension of time for this work or for completion of the entire project. In any event, by accepting this change order and by making changes of its own accord as late as October 1974, which changes delayed the completion of the building, GSA waived any claim it may have had for breach by Haney for failure to deliver the building for occupancy by August 1, 1974. Regardless of whether the Government agreed to an extension of time, Haney is not liable for any delays caused by the Government.

### Kitchen-Cafeteria and Computer Room Delay

The kitchen-cafeteria layout drawing furnished by GSA on March 8, 1973, did not contain the layout or description of the kind of kitchen equipment which was going to be furnished by GSA and did not contain either the location of the rough-in plumbing or the electrical drawings which were to be furnished by GSA for the project. This information was not furnished to Haney until early May 1973, but even then it was not the final information. Between May and August 1973, GSA made further changes to the kitchen-cafeteria layout.

The computer room located on the second floor was to be constructed with specially designed flooring and air conditioning to accommodate the computer hardware. Beginning in late 1972 and extending into the latter part of 1973, GSA discussed with Haney various changes to the computer room, including revision of the layout arrangement for the equipment in the computer room and changing the size of the computer room. Most of those discussions were in connection with the preliminary layout drawings. The preliminary architectural drawings that were approved by GSA provided for considerably larger computer room floor area than was required by the original contract. Haney called attention to the fact that the Government was seeking to require a larger floor area for the computer room than set forth in the contract and the Government acknowledged this by requesting Haney to submit an estimate based on the change order for the additional computer room floor area.

During a meeting on August 28, 1973, between representatives of GSA and Haney, GSA informed Haney that even further changes to the kitchen-cafeteria area and computer room were to be made and that both entire areas were to be placed in a "hold" status until those changes had been communicated to Haney by GSA. While the contract provided that the Government could make changes as construction progressed and set forth a detailed method by which any such changes were to be made, as noted above the contract expressly provided that the Government could not make any changes which would result in a delay of the delivery date of the building. Issuance of these instructions interfered with the performance of the contract and was contrary to the express provision of the contract that no changes were to be made which would delay completion of the building for occupancy by August 1, 1974.

Although the Government had the right to make changes, even where the time is not as critical as in the present case, it would not have "the right to deliberate, in disregard of the interests of the other party to the contract, for as long as it pleases, upon changes so fundamental that the work can go forward only haltingly and uneconomically until the deliberations are concluded." *Anthony P. Miller, Inc. v. United States*, 111 Ct.Cl. 252, 330, 77 F.Supp. 209, 212 (1948).

GSA submitted drawings to Haney with changes indicated for the kitchen area on October 12, 1973. On October 24, 1973, GSA asked Haney to submit his estimate for the change order proposal for the redesign of the kitchen-cafeteria area. On November 2, 1973, GSA furnished a list of the Government-furnished kitchen equipment which was going to be installed by Haney.

It was not until November 1, 1973, that the Contracting Officer for GSA advised Haney to proceed with the computer room in accordance with the redesign and construction changes which had been given to Haney. On November 30, 1973, Haney submitted to GSA the proposed price for the redesign of the computer room and kitchen-cafeteria areas. On December 27, 1973, GSA advised Haney to proceed with the redesign of the kitchen, along with the computer room, and that the request for time extensions for those two portions of the building were to be evaluated at a later time. But even at that time, further information was needed from GSA in order for Haney to proceed with the kitchen-cafeteria design.

GSA reevaluated an earlier decision to deny certain design fees involving the kitchen redesign and agreed to accept the prices which had been quoted by Haney on November 30, 1973. Numerous conferences and the receipt from GSA of further design information occurred in January, February, and March 1974, with the result that it was not until April 4, 1974 that GSA submitted approved and final drawings of the kitchen-cafeteria layout.

On April 4, 1974, GSA also approved the redesign of the computer room area subject to further revisions to the heating, ventilating, and air conditioning system for that area. On June 6, 1974, Haney submitted a

proposed price for the further computer room change order to GSA which also included a reference to the necessity for an extension of time to complete the changed work.

Before Haney could begin construction of the kitchen-cafeteria area, he was required by local building codes to get approval of the kitchen-cafeteria arrangements and equipment by the county health board. (GSA had knowledge of this requirement at least as early as July 1973.) After receiving the April 4, 1974 drawings, Haney promptly tried to get the approval of the county health board. The board withheld its approval pending a more complete and detailed submission. Haney requested more details on the location of connections for, and the exact dimensions of, the kitchen equipment on April 16, and again on May 10, 1974, but since GSA had not even entered into a contract for the purchase of the kitchen equipment until May 1, 1974, the details were not immediately available.

As a consequence of the delay in contracting for the equipment and furnishing the information required by the health authorities, it was not until June 27, 1974, that approval by the county health board was finally received. No construction permits could be obtained until approval was given by the county health board and until such permits were obtained, no inspections would be made by the city's inspectors. It would have been a violation of the local building code and the contract to have started construction without the required permits and inspections.

By telegram dated July 3, 1974, GSA issued authorization to Haney to proceed with the construction called for by the kitchen-cafeteria and computer room change orders and advised him that the price for that work would be determined at a later date. At a meeting on July 19, 1974, between representatives of GSA and Haney, GSA furnished three sets of drawings showing newly revised rough-in plans for the electrical and plumbing work for the kitchen-cafeteria area. These revisions showed substantial changes from the earlier drawings. Rather than change the construction drawings, GSA advised that it would cause the kitchen equipment manufacturer to make the equipment conform to the original rough-in drawings.

During May, June, and July 1974, the contractor developed prices for the change order proposal for the revised kitchen-cafeteria work. In conjunction with those requests he proposed that the schedule be extended until March 18, 1975 for the completion of kitchen-cafeteria work and reserved decision on all delay damages or impact costs on the kitchen-cafeteria work. Although Haney had authorized payment to the contractor of a specific sum for the change order on August 26, 1974, it was not until September 23, 1974, that the Government confirmed its telegram of July 3, 1974, which authorized Haney to proceed with the construction required by the kitchen-cafeteria and computer room change orders.

During meetings between GSA and Haney in July, August, and September 1974, the Social Security Administration and GSA designated the priority in which the respective floors were to be completed, whereby completion of the second floor was given lower priority than other areas which were to be completed first. The computer room area was actually completed on or about May 15, 1975. All delays in completion of the computer room area were caused by GSA.

From August to December 1974, Haney and GSA had discussions concerning the expected date for delivery of the Government-furnished kitchen equipment. Haney advised GSA that the equipment should be delivered by November 1, 1974, to prevent further delay on this and other parts of the project. The equipment was not actually delivered by the Government supplier until December 4, 1974. Upon receipt of the equipment Haney again notified GSA that the responsibility for the delay rested with the Government. Completion of the kitchen-cafeteria area was further delayed due to the late delivery of the Government-furnished equipment, since the structure was ready for installation of the kitchen equipment as of November 1, 1974.

The Government-furnished kitchen equipment, when it arrived, was found to be improperly wired and labeled. To correct this situation, GSA required Haney's field forces to make the necessary wiring changes at the site and issued a change order for that extra work. In addition, certain pieces of equipment failed to match the rough-in for mechanical and electrical work as laid out in the previously approved drawings, thus further delaying installation. The construction of the kitchen-cafeteria area of the building was actually completed on or about March 1, 1975.

The Government was solely responsible for the delay and extra costs relating to the completion of the kitchen-cafeteria and computer room areas. GSA's delay in making changes and in not ordering the kitchen equipment until May 1974 was inexcusable, especially in light of the fact that the original occupancy date of the building was to be August 1, 1974, and since time was of the essence. *See Anthony P. Miller, Inc. v. United States, supra.*

### EXTRA WORK CLAIMS

#### Air-Handlers for Exterior Zone of Building

Haney originally proposed to utilize a two-part heating, ventilating, and air conditioning (HVAC) system: (1) a single-zone, constant volume, variable temperature system which would take care of the periphery of the interior of the building; and (2) a variable air volume (VAV), constant temperature system which would take care of the interior space by offsetting the interior zone heat gains from people, lights, and equipment.

The single-zone, constant volume perimeter HVAC component was to be controlled by an outdoor sensor which would regulate the air along the perimeter of the building (the layer of air, 1 to 6 inches wide, bordering the four exterior walls of the building). Located on the north wall of the building,

the outdoor sensor would operate to cause the perimeter system to either heat or cool so as to neutralize the transmission loss or gain of the building "skin" due to changes in the outdoor ambient temperature.

The VAV system was to be a cooling only system. In view of the mild climate in Birmingham, its function was merely to cool the interior of the building and relieve the heat gain from people and equipment.

The Government accepted Haney's proposal with respect to the VAV "interior" component of the HVAC system. However, the Government rejected the proposed "perimeter" component of the HVAC system by letter dated March 7, 1973. The letter stated numerous grounds for the rejection; the most important were that:

(a) The air-handling units were arranged so that the interior zones of the building were served by the same air-handling units serving the "exterior zones" instead of using separate units for the respective zones; (b) the limit of the exterior zone was to be 15 feet from the exterior wall; and (c) vertical zoning for systems was not acceptable.

After GSA's rejection of the proposed single-zone air-handling unit for the exterior zone of the building, plaintiff designed and installed, under protest, a multi-zone air-handling unit component for the exterior HVAC zone of the building. By letter dated August 21, 1973, Haney advised GSA that it would comply with GSA's directions and would perform, under protest, the changed and additional work required in deleting the single-zone perimeter air-handling units, and in replacing these units with multi-zone air-handling units. As a result of the installation of a multi-zone air-handling unit component, additional and unanticipated costs were incurred.

In essence, the system originally proposed by Haney, and the one eventually installed [4] work on the same basic principle. In Ha-

---

4. The Government has consistently maintained that even the system which was installed does not fully comply with the contract requirements, although it comes closer than Haney's original system. However, the Government agreed to the multi-zone system which was installed to facilitate the building's progress.

ney's system the perimeter zone was limited to 1 to 6 inches, while in the Government's system the exterior zone extended inward on the order of 15 feet.

The installed system has the advantage of being zoned by each face of the building, that is, the air circulation for each face of the building is independently controlled. Thus the multi-zone system is better able to compensate for the differing amount of solar heat gain experienced by each face (north, south, east, and west) of the building. This system is also superior in compensating for solar heat gain because, unlike transmission through the walls, solar heat gain can be effected more than 6 inches from an exterior wall, particularly where there are windows. This is an important feature in buildings located in a climate such as that in Birmingham, Alabama, and the contract expressly required that solar heat gain due to different external exposures be taken into account.

A reading of the contract compels the conclusion that Haney's original proposal did not meet the contract requirements. The contract contemplated an exterior zone system similar to that which was eventually installed. The contract required that "the *limit* of the exterior zone shall be 15 feet from the exterior wall." (Emphasis supplied.) Haney contends that 1 to 6 inches is less than 15 feet, and thus his proposal met the requirements. However, the substantial difference in relative magnitude between 6 inches and 15 feet shows that Haney's proposal was conceptually quite different from what was contemplated by the contract.

The Trane Company's application manual for the HVAC system states that "a *minimum* depth of 12 to 15 feet and up to a maximum of 20 feet may be considered the practical limit affected by the wall and window surfaces." (Emphasis supplied.) This applies only "where partition layouts have not been established to define the perimeter area * * *."

### Use of Wall-Mounted Thermostats

Haney anticipated using unit-mounted thermostats, as opposed to wall-mounted thermostats, in the HVAC system. Unit-mounted thermostats are located within the ducts above the ceiling, whereas wall-mounted thermostats may be mounted on walls, columns, or partitions.

By letter dated July 14, 1972, Haney supplied GSA with a written clarification of the HVAC system which he proposed to install in the building. A portion of this letter, which was subsequently incorporated into the contract, provided that Haney would use "constant volume terminals similar to Carrier Moduline units to wash the interior of the building "skin." The contract itself provided, in pertinent part, as follows:

4.3 *Zoning.* * * * Variable volume type of air distribution system for temperature control purposes will be acceptable when used in conjunction with linear slotted air terminals.

The variable volume ceiling terminals shall:

1. Be factory assembled, tested, and rated.

\* \* \* \* \* \*

5. If wall mounted thermostats are used, they shall be pneumatic type.

\* \* \* \* \* \*

8. The entire system should be designed in accordance with the written recommendations of the manufacturer of the variable volume air system.

The HVAC system originally proposed by Haney was "similar to a Carrier Moduline unit" and depicted the planned use of unit-mounted thermostats, as did all "similar Carrier Moduline units."

After first reviewing Haney's proposal for the use of unit-mounted thermostats, GSA responded that, although the use of unit-mounted thermostats was not specifically designated in the manufacturer's regular factory-printed brochure, Haney would be allowed to use unit-mounted thermostats on the exterior HVAC zone of the building, but not for that part of the HVAC system which served the interior zones of the build-

ing. GSA directed Haney to revise the design proposal accordingly to show wall-mounted thermostats.

By letter dated August 21, 1973, Haney advised GSA of his protest with regard to GSA's direction to use wall-mounted thermostats. Haney furnished under protest, wall-mounted thermostats which cost more than unit-mounted thermostats; therefore, Haney incurred additional and unanticipated costs as a result of the Government's rejection of unit-mounted thermostats.

GSA's primary objection to the planned use of unit-mounted thermostats with the proposed HVAC system was that the use of unit-mounted thermostats was not specifically depicted in the equipment manufacturer's written instructions contained in its regular factory-printed brochure, as required by the solicitation. The use of unit-mounted thermostats was, however, depicted and recommended in the manufacturer's later-issued engineering bulletin. This engineering bulletin was considered by the manufacturer to be part of its regular factory-printed brochure, which updated and supplemented the company's sales manual.

The contract did not state that wall-mounted, rather than unit-mounted thermostats were to be used. Section 4.3(5) of the contract (quoted above) shows that the contract contemplated giving Haney an option as to the type of thermostat to be used, as long as the use of such thermostats was in accordance with the manufacturer's "written recommendations." The bargain struck between Haney and the Government was not for either unit-mounted thermostats or wall-mounted thermostats, but was for proper and recommended thermostats.

The use of unit-mounted thermostats for the HVAC system for the Birmingham project was specifically recommended in writing by the Trane Company representative. The Trane Company application manual, as updated, also allowed for the use of unit-mounted thermostats and is within the meaning of a regular factory-printed brochure, and thus the use of unit-mounted

thermostats was permissible under the contract. Thus the Government could not, under the contract, require the use of wall-mounted thermostats and Haney is entitled to recover his additional costs in this regard.

### Auditorium and Multi-Purpose Room Air Handler

The auditorium and multi-purpose room were adjacent to each other and separated by movable partitions which might be opened or closed, depending upon the occasion. The contract provided that the multi-purpose room should be served by the same air handler serving the auditorium, but should have its own separate zone control. Haney originally proposed and planned to use a single-zone heating and cooling system with separate controls for the auditorium and the multi-purpose room. The system would have consisted of a single-zone air-handling unit, with a wall-mounted thermostat in each separate space (*i.e.*, one thermostat in the auditorium and one thermostat in the multi-purpose room). A reheat coil was to be provided in the duct leading to each separate space for reheating the air as required in order to raise the temperature in either separate space in the event one or the other became too cool.[5]

The nature and purposes of the convertible auditorium/multi-purpose room were such that the occupancy of one space might be zero at the same time that the other was 100 percent. In such a case only one room might require cooling at a given time. The Government felt that energy would be wasted by Haney's system, because if the heat load of the occupied room activated the single-zone air-handling unit which plaintiff had proposed to use, the cool air going to the unoccupied room would be too cool and would have to be reheated to keep the temperature in the unoccupied room at a comfortable level and ready for use. In other words, after having used energy to cool the air going to both rooms while only

---

**5.** The Government insisted that Haney install a multi-zone system. In the multi-zone system,

the auditorium and multi-purpose room can be individually cooled.

one was occupied, under plaintiff's proposal, energy would be used to reheat the cold air going into the unoccupied room (which presumably would not need as much cooling). While the operating cost of the single-zone system (with reheaters) might be greater than that of a separate (multi-zone) system, the original cost and installation of a single-zone system would be less.

The contract, at Paragraph 4.18.0 q. provided, in part, that "[t]he use of a terminal reheat system, to control final room temperatures, will not be acceptable (except as required for Special Purpose spaces such as the computer room complex, or other Special Purpose areas as specifically approved by the Government)." The Government, by designating the two areas in question as an auditorium and a multi-purpose room respectively, impliedly approved and designated those areas of the building (in addition to the computer room) as "Special Purpose Areas." Haney, with good reason, considered the multi-purpose room and auditorium to be special purpose areas within the meaning of the contract, in view of the fact that almost all of the subject building was made up of office space.

Haney's view is the most reasonable interpretation of the contract. This becomes more apparent when the above provision is read in conjunction with Paragraph 4.11.0 c. of the contract which requires that completely separate heating and cooling systems shall be provided for the computer room complex, guard room, auditorium, cafeteria, and kitchen area; it seems likely that Paragraph 4.18.0 q. was intended to leave open the possibility of use of terminal reheaters in these rooms. The purpose of the above-quoted portion of Paragraph 4.18.0 q. was to prevent the general use of terminal reheaters in areas of the building which were to be used as normal office space. Thus Haney's proposed system met the contract requirements.

In order to comply with the Government's demands, Haney installed a multi-zone air-handling unit for the auditorium and multi-purpose room. The installation of these units resulted in a higher initial purchase and installation cost for Haney (although a lower long-term operating cost for the Government) than would have been the case if a single-zone air-handling unit had been installed in this area. Since Haney's originally proposed system would have complied with the contract, he is entitled to recover his related increased costs.

*Extra Electrical Work*

When Haney first entered into the contract, he was not aware of the specific use to be made by the Government of the additional 150,000 square feet of space which the Government could acquire by exercising its option. Nevertheless, Haney was required to estimate and submit his bid for the addition of this space to the building. Haney did know that the general makeup of the building was to be office space. Indeed, Haney considered nonoffice areas to be "special purpose areas." (See previous section.)

The contract originally provided:

5.9.4 Power and Telephone Outlets—A total of approximately 750 floor and/or wall convenience outlets and approximately 500 floor and/or wall telephone outlets shall be provided. Location to be designated by the Government. This is in addition to outlets shown or located elsewhere herein.

These outlets were intended to be used to equip the various work areas and desks in the offices and space originally planned. In addition to the wall and/or floor power and telephone outlets specifically required by the above contract provision, other telephone and power outlets were "shown or located" and thereby required by other sections of the contract. For instance, Section 5.9.8 required outlets for certain special purpose areas in the building, and other solicitation sections required outlets on columns and an additional quantity of outlets which depended upon the number of feet of permanent and linear partitioning installed in the building. Although the contract provided for specific numbers of convenience and telephone outlets, no provision was made for determining the total number of

outlets to be provided for the additional space should the Government exercise its option.

In submitting a price for the addition of the three floors necessary to increase the building by 150,000 square feet, Haney expected to provide only the basic lighting and utility services which were standard on the other typical floors of the building; that is, general lighting, central switching, wiring in the fan rooms, wiring in the cores, panels and feeders, fire alarm, and outlets in the existing walls and columns as specifically required by the contract and located on the drawings. On the other hand, GSA expected Haney to install a number of outlets on the three added floors which would correspond to the average total number of outlets installed on the other floors of the building (including the outlets specified in Section 5.9.4). That would mean 250 additional floor and/or wall convenience outlets and 125 additional floor and/or wall telephone outlets. The Government's position comports with the parties' intention that the primary use of the building was to be general office space.

Since the building was to be general office space, Haney should have known that each floor would have to be equipped with enough outlets to provide a reasonable number of convenience and telephone outlets for an office environment. That amount is best determined by looking at the other floors in the building. Any additional work beyond what was required on the other floors would have to be paid for by the Government (see next section), but the Government was entitled to sufficient electrical outlets to be able to use the floors for their intended purpose.

### Modular Lighting Work

The electrical drawings originally approved by the Government depicted a modular lighting layout for the typical general office use floors (three through eleven). In reliance upon this approved modular layout, Haney proceeded to prefabricate branch circuitry, conduit and wiring, and to install some of the branch circuitry on the added three floors of the building. As a result of the Government's decision to locate the executive offices on the eleventh floor instead of the eighth, and as a result of the revisions by the Government to the interior layout for the upper three floors (nine through eleven), Haney was required to alter the modular lighting layout on those three floors. This alteration required that plaintiff remove certain branch circuitry previously installed, scrap certain prefabricated electrical work, and rework certain conduit and wire systems. This rewiring and added work caused Haney to incur additional costs through no fault on his part.

The new Government-furnished lighting pattern layout required that Haney install 211 light fixtures for which he was not compensated. The request for additional compensation for these fixtures was presented by Haney to the Government as F & M Change Order Proposal No. 47A. The fixtures were not required under the contract, thus the Government is liable for the additional cost of such fixtures, less any allowance for costs saved by Haney in not being required to install the fixtures on the eighth floor area where the executive offices were originally planned.

### Refreshment Area

Haney's bid and original proposal was based upon the "stacking" of the two supplemental refreshment areas in such a way that they would be vertically juxtaposed on different floors within the building. This means of locating the supplemental refreshment areas (one above the other) allowed Haney to consolidate and economically install the utilities required to service the supplemental refreshment areas. However, the contract, as amended, expressly reserved to GSA the right to designate the specific location of the refreshment areas.

After construction had commenced, GSA required that the fourth floor supplemental refreshment area be located in the southeast corner of that floor, and the seventh floor supplemental refreshment area be located in the northwest corner of that floor. By locating the two areas in opposite cor-

ners of the building, modification of the utilities layout and construction for each of those two floors was necessary. Haney followed the direction of the Government for the location of the supplemental refreshment areas, however, after notifying GSA that he was proceeding with the changed construction as directed, under protest.

The modifications caused Haney and his contractors to incur additional costs, including the additional cost of installing additional plumbing stacks, water pipes, and drainage facilities. While the Government may have had some right to designate the location of the supplemental refreshment areas, it could not exercise that right in a manner contrary to sound architectural engineering design and cause the areas to be located in a nonstacked manner. Therefore, defendant is liable for the additional costs incurred in relocating the refreshment areas.

### Use of Precast Concrete in Equipment Areas

Haney's original proposal to the GSA provided for the boiler room, transformer room, and telephone equipment room to be located beneath the raised parking deck and called for the use of painted concrete block as the exterior wall surface for these equipment areas. GSA rejected this planned utilization of painted concrete block as the exterior material for these rooms and required that Haney enclose these equipment room areas with the same exterior material utilized by plaintiff as the primary material for the construction of the upper (visible) portions of the building (precast concrete). Because the equipment room areas were located beneath the raised parking deck, away from the public streets surrounding the building, and obscured from the public view, plaintiff's use of painted concrete block would not have violated the solicitation requirements regarding the "appearance" of the building exterior.

In accordance with the solicitation, Haney had planned and proposed to use precast concrete as the "primary material" in the construction of the building exterior.

Proceeding under protest, Haney changed his original plan and constructed the exterior walls of the equipment room, transformer vault, cooling tower screen, and boiler room with precast concrete instead of painted concrete block. As a result, plaintiff incurred increased construction costs not warranted by the contract, and is entitled to recovery for such increased costs.

### Summary

The construction of the Social Security Payment Center in Birmingham, Alabama, was replete with unwarranted interferences and delays by the Government. The delay in the construction and completion of the building for occupancy was caused by Government failure to timely provide information and equipment which it was contractually obligated to supply. The plaintiff was interrupted by the Government in the orderly performance of his work in such a manner that he could not progress on the schedule he had originally planned. The delays for which the Government was responsible resulted in additional costs to the plaintiff.

Plaintiff is entitled to recovery in accordance with the foregoing opinion, for the additional costs incurred as a result of the work performed at the insistence of the Government which was not required by the contract. Since the delay in delivery of the premises ready for occupancy by the Government was attributable to the Government, the Government's counterclaim for late delivery of the premises for occupancy is dismissed.

The amount of recovery to which plaintiff is entitled will be determined in further proceedings under Rule 131(c).

### CONCLUSION OF LAW

Upon the findings and foregoing opinion which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover on his claim and that defendant is not entitled to recover on its counterclaim, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c).