**AVEDON CORPORATION, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 617–86C.**

United States Claims Court.

Oct. 31, 1988.

lief as it deems proper, including but not limited to injunctive relief" in contract bid protest cases.

**649**

John R. Tolle, Vienna, Va., for plaintiff.

Anthony H. Anikeeff, with whom were Asst. Attys. Gen. John R. Bolton, David M. Cohen, and Mary Mitchelson, Washington, D.C., for defendant; John McMunn, Dept. of the Navy, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action under the Contract Disputes Act, 41 U.S.C. §§ 601–13 (1982) involving three claims for delay costs in the total amount, including interest, of $87,-691.57. Trial was held August 22–24, 1988. For the reasons discussed below, the court concludes that plaintiff is not entitled to recover on any of its claims.

## I. BACKGROUND FACTS

The Department of the Navy, Naval Facilities Engineering Command, awarded Contract No. N62474–82–B–0491, dated June 18, 1984, in the amount of $2,540,000 to Avedon Corporation. The contract called for the construction of a two-story temporary lodging facility ("TLF") at the Marine Corps Base, Camp Pendleton, California. The originally scheduled contract completion date was April 14, 1985. However, the contract date was extended a total of 266 days to January 5, 1986 due to contract modifications issued by defendant. Defendant considered the contract substantially complete as of May 2, 1986.

### A. Facts Related to Initial Start Delay

The contract required Avedon to submit a quality control plan to defendant prior to beginning construction.[1] General Provision 76(c) of the contract specifically addressed the requirements for the contractor's quality control ("CQC") plan. It read in part:

---

1. The parties stipulated that claims previously asserted by Avedon Corporation on behalf of one or more of its subcontractors are waived.

The parties also stipulated that plaintiff's claim to repayment of liquidated damages assessed against it is not an issue.

The contractor shall furnish four copies of the CQC plan to the Contracting Officer within fifteen calendar days after receipt of the Notice of Award. The CQC plan shall detail the procedures, instructions, and reports to be used to assure compliance with the contract. Unless specifically authorized by the Contracting Officer in writing, no construction will be started until the CQC plan is approved.

Defendant notified plaintiff of award of the contract by its letter of June 18, 1984. The letter of award iterated the need to submit a CQC plan prior to commencing construction. Avedon acknowledged receiving the notice of award on June 20, 1984. The CQC plan was thus due no later than July 5.

A CQC plan had not been submitted when a preconstruction conference was held on July 16, 1984. The parties agreed at that time that work on the project would commence about July 30, 1984. Joseph Stevenson, Avedon's CQC representative, did not arrive at the jobsite until July 30, however, and only then began work on the CQC plan.

Plaintiff submitted its initial CQC plan to defendant on August 6, 1984. After interim discussions, defendant rejected the proposed plan by letter of August 22, 1984. Deficiencies perceived in the plan were set forth in an attachment to the letter. Plaintiff submitted supplemental CQC material to the Navy on August 31, 1984. At a meeting between Avedon and the Navy on September 6 the Navy approved the plan and authorized construction to proceed. Construction began on September 7, 1984.

By letters of April 30 and June 13, 1985, Avedon submitted a claim, as amended, to the Resident Officer in Charge of Construction ("ROICC"), seeking an extension of 32 calendar days and an adjustment of $43,-678.86 for claimed unreasonable start-up delay due to bad faith in consideration and approval of the CQC plan. Avedon alleged that the real reason approval of the plan took so long was that defendant wanted to temporarily delay the project to avoid parking problems which would result at a swimming pool adjacent to the building site. The claim was denied.

B.   Facts Related to the Vending Alcove Claim

After construction of the TLF was underway, Avedon noticed a discrepancy between architectural and structural drawings supplied by defendant. An architectural drawing showed a vending alcove located along a wall of the second floor reception area. The alcove was represented by a portion of the wall being inset a number of feet. The structural drawing, however, indicated only a continuation of the wall at that location. By Request for Clarification No. 23, dated April 10, 1985, Avedon sought resolution of the discrepancy. In the request, Avedon stated that it bid the job expecting to include the alcove.

The Assistant ROICC ("AROICC"), Lt. Herring, initially responded to the request orally by directing Avedon to build according to its interpretation, i.e., to include the vending alcove, pending further clarification from the architect. This is confirmed by Lt. Herring's April 24, 1984 letter to Avedon and by his letter of April 30 forwarding the architect's direction to add a structural steel beam to support the alcove.

Avedon submitted an unsolicited cost proposal for work on the alcove and addition of the beam in the amount of $24,304 on May 8, 1985. Negotiations were subsequently held during which plaintiff's cost proposal was reduced to $5,000, not including the delay claim. On May 17,[2] the ROICC office rejected Avedon's cost proposal and directed it to install a wall in accordance with the structural steel specifications, that is, without the alcove. Because Avedon had begun putting anchor bolts in to support the recessed wall, this decision required Avedon to remove the bolts and do other minor corrective work.

By letter of September 16, 1985, Avedon submitted a claim seeking 37 additional

**2.** Some of plaintiff's documentary evidence suggests this occurred May 22. However, the complaint at paragraph 38 and defendant's evidence reflect that it took place May 17.

days on the contract and an equitable adjustment of $37,329. The claim sought $294 attributable to plaintiff's direct costs related to the vending alcove and $37,035 attributable to claimed overhead and profit. Avedon supported the claim on the basis of the Navy's asserted unreasonable delay in clarifying the defective specifications, and based on the specifications themselves.

By memorandum from the ROICC to the Commander, Western Division ("WEST-DIV"), Naval Facilities Engineering Command ("NAVFAC") dated December 19, 1985, the ROICC office recommended that Avedon's vending alcove claim be denied, but recommended that Avedon be compensated for the cost of work actually performed on the vending area prior to its deletion. By Final Decision No. WD 85–86, dated December 9, 1985, the Contracting Officer ("CO") authorized the ROICC office to negotiate a settlement for Avedon's actual costs for work performed for the vending area, but denied the delay claim.

## C. Facts Related to Door Switch Delay Claim

The temporary lodging facility contract called for installation of a door frame and a window frame in the exterior wall of each unit. As an energy conservation measure, an automatic switch for the air-conditioning fan was to be installed with the door frame so that the fan would turn off when the door was opened. A push button switch inside the room would then be used to restart the fan. The contract required that the contractor furnish the switches and associated wiring.

While reviewing plans for the project, an electrical contractor, Honeywell, Inc., noticed that while a switch to turn off the fan was noted in certain drawings, it was not sufficiently detailed in the door plans or specifications. Honeywell also commented that wiring for these units had not been described on the electrical drawings.

Honeywell conveyed this information by its letter of December 5, 1984, to R.P. Richards, Inc., Avedon's mechanical contractor. By letter of December 10, 1984, R.P. Richards transmitted the Honeywell letter to Avedon for its review and advice. On Feb. 14, 1985, Avedon submitted Request for Clarification No. 15, in which it explained the lack of specifications for the switch and noted that its own interpretation for bid purposes had been an "exterior screw mounted" switch.[3]

Defendant responded to Avedon's clarification request in its letter of April 3, 1985: "[t]he 120 volt rated door switch shall be mounted in the door frame. An exterior mounted switch is not acceptable. Contract modification may be necessary. A request for proposal shall be forthcoming via separate correspondence."

Subsequently an additional Request for Clarification, No. 24, was submitted by plaintiff. This request asserted there was a discrepancy in the drawings as to whether the switches were "low-voltage" (12–24 volt) or "high-voltage" (120 volt). Avedon interpreted the drawings to require a low-voltage switch. It was shown at trial, however, that the drawings in fact indicated that the wiring was to be high-voltage.

The Navy requested, by letter of April 24, 1985, a cost proposal to "delete installation of fan coil door switches called for by the contract and install 120 VAC fan coil door switches which are mounted in the door frame." The letter further specified that it was a "request for a cost proposal only and [was] not to be construed as an Authorization to Proceed, such authorization being withheld pending receipt and review of your cost proposal." Avedon submitted such a cost proposal, dated April 25, 1985, in the amount of $40,381, of which $10,219 was attributable to subcontractors' claimed costs, $1,035 was attributable to Avedon's claimed costs for labor and mate-

---

**3.** The request for clarification read as follows:
DESCRIBE ITEM TO BE CLARIFIED:
  DOORSWITCH
  Only reference found on two (2) drawings
  E–7 under note 2
  M–7 detail 8/M–7/M–7

  No description given
  No specification found
CONTRACTOR'S BID INTERPRETATION (IF APPARENT CONFLICTS):
  Exterior screw mounted.

rials, and the remaining $29,127 was attributable to Avedon's claimed overhead, insurance, and profit. The proposal indicated and testimony confirmed that installation of the internally-mounted door switches required return of the door frames to the manufacturer to cut appropriate openings in the door frames.

The Navy rejected Avedon's cost proposal on May 9, 1985, and directed Avedon to install low-voltage, externally-mounted door switches on the door frames. The externally-mounted door switches could be installed after the door frames were in place and required no off-site work on the frames. In addition, the wire for the low-voltage system was smaller and did not have to be run through metal conduit, as did 120 volt wire. Avedon submitted a cost proposal for the externally-mounted door switches, dated May 10, 1985, in the amount of $38,156, of which $1,391 was attributable to Avedon's claimed cost of labor and materials and the remaining $36,-765 was attributable to Avedon's claimed overhead and profit.

By letter of September 16, 1985, before a final decision on its cost proposal, Avedon submitted a delay claim to the Navy in the door switch matter. The claim sought an extension of 39 days and an adjustment of $41,971, of which $3,393 was attributable to a subcontractor's claimed costs, $1,391 was attributable to Avedon's claimed costs for materials and labor, and the remaining $37,187 was attributable to Avedon's claimed overhead and profit.

The CO, by Final Decision No. WD 2–87, dated January 8, 1987, denied Avedon's delay and costs claims, and authorized the ROICC to issue a modification to the contract reducing the contract price by $4,733 to account for the lower cost of the low-voltage, externally-mounted door switches. Such a modification was issued unilaterally by the ROICC after execution of the modification was refused by plaintiff.

## II. DISCUSSION

### A. Applicable Law

Avedon's claims are based on the "Suspension of Work" clause, General Provision 17 of the contract, which states in part:

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer ... an adjustment shall be made for any increase in the cost of performance of this contract ... necessarily caused by such unreasonable suspension, delay or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

Both the Claims Court and its predecessor, the Court of Claims, have held that under the suspension of work clause, the contractor may be awarded compensation for "government-caused delays of an unreasonable duration." *Beauchamp Construction Co. v. United States*, 14 Cl.Ct. 430, 436–37 (1988) (citing *John A. Johnson & Sons v. United States*, 180 Ct.Cl. 969 (1967); *Chaney and James Construction Co. v. United States*, 190 Ct.Cl. 699, 706, 421 F.2d 728, 731–32 (1970)). The clause makes an adjustment unavailable, however, "to the extent that other causes, attributable to said contractor, would have simultaneously suspended, delayed, or interrupted contract performance." *Beauchamp*, 14 Cl.Ct. at 437.

The delay need not be a Government ordered work stoppage to be compensable. Any unreasonable delay directly caused by Government action will be considered a constructive suspension of work for purposes of the clause. *John A. Johnson & Sons*, 180 Ct.Cl. at 984–85; *see Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 197, 351 F.2d 956, 967–68 (1965). Furthermore, contract completion need not necessarily be delayed. Delay to part of the performance may re-

sult in compensation. *See Chaney*, 190 Ct.Cl. at 713, 421 F.2d at 733.

In sum, to recover, the contractor must show: (1) the delay is of an "unreasonable length of time," *Wunderlich*, 173 Ct.Cl. 197, 351 F.2d at 967 (citing *River Construction Corp. v. United States*, 159 Ct.Cl. 254, 270 (1962); *F.H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 506–07, 130 F.Supp. 394 (1955)); (2) the delay was proximately caused by the Governments actions, *id.* (citing *River Construction*, 159 Ct.Cl. at 270; *Laburnum Construction Corp. v. United States*, 163 Ct.Cl. 339, 325 F.2d 451 (1963); *J.A. Ross & Co. v. United States*, 126 Ct.Cl. 323, 331–34, 115 F.Supp. 187 (1953)); and (3) the delay resulted in some injury to the contractor, *see id.* 173 Ct.Cl. at 199, 351 F.2d at 968 (citing *River Construction*, 159 Ct.Cl. 254; *Addison Miller, Inc. v. United States*, 108 Ct.Cl. 513, 70 F.Supp. 893, *cert. denied*, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (1947); *J.D. Hedin Construction Co., Inc. v. United States*, 171 Ct.Cl. 70, 86–87, 347 F.2d 235, 246–47 (1965)).

In showing that the Government was the cause of the delay, the contractor must show that it was the "sole proximate cause" of the delay, and that no concurrent cause would have equally delayed the contract regardless of the Government's action or inaction. *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 650, 528 F.2d 1392, 1397 (1976). This is not to say that where there are concurrent delays, a contractor may not attempt to prove the effect of government caused delay as distinct from others. Rather, "[t]he general rule is that '[w]here both parties contribute to the delay, neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each.'" *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984) (quoting *Blinderman Construction Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982); *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–15 (1944)). As a result, "[c]ourts will deny recovery where the delays are concurrent and the contractor has not established

its delay apart from that attributable to the government." *Id.*

**B. The CQC Plan Delay Claim**

Plaintiff seeks $49,936 and a time extension of thirty-two calendar days for the Navy's alleged "unreasonable disapproval" of plaintiff's CQC plan. The relevant facts are recited *supra* at pages 649 to 650.

Avedon was not allowed to start work until September 6, 1984 when its CQC plan was approved. Further, the evidence showed its willingness to begin work before that date. Avedon asserts that the reason for the delay in approval was bad faith on the part of the ROICC office at Camp Pendleton. It contends the ROICC office delayed approval of the plan and refused to give notice to proceed with the contract in order to keep a base swimming pool parking lot open until school started.

Avedon faces a difficult burden in proving bad faith on the part of the Government. Government officials are presumed to carry out their duties in good faith. *Haney v. United States*, 230 Ct.Cl. 148, 152, 676 F.2d 584, 586 (1982). Avedon must produce "well-nigh irrefragable" proof of bad faith on the part of the government to rebut this presumption. *Id.* Plaintiff's task is made more difficult by the fact that the actions it seeks to prove unreasonable seem, on their face, to comport completely with the terms of the contract.

As support for its allegations Avedon offers the testimony of Paul Woods, its Project Supervisor, and Sonja Cherry, an Avedon employee who assisted in administering the TLF project. Woods testified that sometime after the preconstruction conference, approximately July 20, 1984, he walked the construction site with Wayne Ferrare, Construction Representative for the ROICC office. He described a conversation in which he and Ferrare discussed parking at a pool adjacent to the TLF site. Construction of the TLF would require pool patrons to use a parking lot further from the pool. Woods stated he offered to build steps down an embankment to give more

direct access from the second lot to the pool. According to Woods, Ferrare declined and stated the base carpenter would build the steps. Ferrare then indicated, according to Woods, that officers' wives who used the pool would complain to their husbands about parking and the husbands would notify their superiors, so that Avedon "may be held up with a paperwork delay."

Mrs. Cherry described a virtually identical conversation taking place in the construction trailer at another building site nearby.[4] This conversation allegedly took place July 18, 1984, presumably prior to the Woods–Ferrare conversation. Woods, Ferrare, and Lt. Murdter were all present according to Mrs. Cherry. Ferrare allegedly indicated Avedon would not be able to start construction until some provision was made for parking at the pool. Mrs. Cherry then offered to have Avedon build steps over the embankment to provide direct access from the upper lot. Ferrare rejected this proposal, then indicated Avedon would be held to the terms of the contract regarding the CQC plan and Notice to Proceed ("NTP"). Ferrare testified, but did not challenge these assertions. Lt. Murdter testified that he remembered walking the site with Ferrare and Woods and remembered a meeting in the trailer at the data processing center, but substantively he could only remember some discussion of building steps during the former. Thus, he did not directly contradict the statements of Cherry and Woods. The court therefore finds that Ferrare did make the statement regarding a paperwork delay and Avedon being held to the terms of the contract.

In addition to the above testimony, Avedon offers circumstantial evidence that the delay was unreasonable. It notes that final approval of the CQC plan corresponded roughly to the start date of local schools, when pool use presumably declined. Further, Avedon offered testimony that it has been allowed to begin work on other jobs prior to approval of a CQC plan.

The court finds this evidence does not constitute sufficient proof to rebut the presumption of good faith. Taken at face value, the comments made by Ferrare to Woods are vague and speculative in nature. Ferrare said there *would be* complaints. There is no evidence that in fact these complaints were made resulting in pressure for delay. Furthermore, Woods testified that he inferred the "paperwork delay" that Ferrare suggested was a holdup of the CQC plan since the CQC plan was "the main thing stopping us right at that moment," but Ferrare did not state that he meant the CQC plan, and in fact government approval of the CQC plan was not holding Avedon up, rather Avedon had not even submitted a plan as of July 20, 1984. Mrs. Cherry's testimony asserts only, and she admitted on cross-examination, that she was told Avedon would be required to comply with the terms of the contract. While she suggests the proper inference to be drawn from the testimony is bad faith on the part of the Government, it is impossible, without more, for this court to characterize as bad faith the simple enforcement of contract terms.

There are other troubling aspects of Avedon's case based on Woods' and Cherry's testimony. First, despite the fact that Ferrare's supervisor, Lt. Murdter, the AROICC, was present at both conversations, neither Woods nor Cherry asked him for clarification of these comments or sought a direct answer from him as to whether some kind of delay was likely. Neither witness asserted that Lt. Murdter made any comment about a delay; Mrs. Cherry expressly indicated he did not. Second, despite the fact that Avedon apparently had warning on June 18 that it would be required to obtain approval of its CQC plan prior to construction, its CQC representative was not on-site until June 30, 1984, and its initial CQC submission ws not until August 6. This time lag is even more surprising where Avedon's complaint states that the plan submitted was the same as that submitted earlier on another job. The court

---

**4.** Besides the contract to construct the temporary lodging facility, Avedon concurrently was under contract with the Navy to construct a data processing center at Camp Pendleton.

finds the additional circumstantial evidence unconvincing.

The conclusion Avedon asks the court to draw is also rendered untenable by evidence that the CQC plan was, in fact, evaluated in good faith. Lt. McKinley, head of Area One, Camp Pendleton, for the ROICC office, testified that the TLF project was under his supervision. He testified that he did not receive any directions to delay the project. Furthermore, he had no request from anyone to delay the project and this included Ferrare and Murdter, who, he said, had never even raised the parking problem as an issue with him. He indicated Ferrare had no authority in the CQC approval decision other than to review a copy of the plan on submission and communicate with the contractor regarding deficiencies. The determination of deficiencies upon which the approval decision was primarily based, was a joint effort with Lt. Murdter. Murdter testified that he was not ordered to delay the project. Further Mrs. Cherry testified that Lt. McKinley made no statement or indicated in any way that he planned to delay the project.

This testimony was supported by Jack L. Spikerman, who was Acting Support Director for Base Special Services ("BSS") during construction of the TLF and who represented BSS at the preconstruction conference. BSS was responsible for maintenance of the pool facilities. Spikerman testified that, rather than wanting to delay the project, BSS was very anxious to see it proceed since it was BSS which originally initiated the TLF project in 1978. Spikerman's recollection of discussion regarding the pool at the preconstruction conference was limited. He remembered his comment expressing concern about dust from the pool. He was unsure whether a discussion regarding parking had been part of the preconstruction conference. His only recollection concerning parking was some discussion with his superior at BSS and the pool manager in which it was determined that the alternate parking area would be used and was accessible and he recalled further that steps were considered only in the context of a possible need during the winter months. This testimony was supported by Mrs. Cherry who recalled, regarding the preconstruction conference, only that Mr. Spikerman indicated construction was "interfering with their client parking and [BSS was] concerned about the dust in the pool." Furthermore both Mrs. Cherry and Woods stated no one mentioned any delay of the project at the preconstruction conference.[5]

The testimony above which suggests the CQC approval was proper is further supported by the apparent textbook treatment of the CQC plan. General Provision 76(c) establishes in detail the requirements for the CQC plan and notes that no work can progress without its approval, absent written authorization from the CO. *See* discussion p. 650, *supra.* Lt. McKinley testified that despite having reviewed approximately eight CQC plans in his tenure with the ROICC office he had never allowed a contractor to commence work prior to CQC approval. He testified that normally a preconstruction conference is held, the contractor submits a CQC plan, it is reviewed, a CQC conference is held at which the plan is discussed, and absent further problems, the CQC plan is approved and work begins. McKinley also said the review normally takes 2–3 weeks.

In this case, initial review of the CQC plan took fifteen days—from August 6, when Avedon submitted it, to August 22, when Avedon was officially notified of its rejection.[6] The letter rejecting the plan

---

5. Avedon's letter of April 30, 1985, seeking an extension and adjustment of the contract asserts that Spikerman and other representatives of BSS were adamant at the preconstruction conference about maintaining the parking lot. However, no testimony supported this assertion. Even William Cherry, who wrote the letter and attended the conference, failed to testify to this effect. The court therefore gives the letter virtually no weight.

6. The stipulations and evidence showed that on August 20, while Lt. McKinley was away on leave, William Cherry called the ROICC office and requested a NTP from Lt. Murdter. Lt. Murdter gave a verbal NTP at this time. Upon McKinley's return on August 21, he immediately directed Lt. Murdter to rescind the NTP pending approval of Avedon's CQC plan. The NTP was rescinded. Avedon seeks no direct costs resulting from this false start; however, it suggests

outlined twelve deficiencies in the plan based, according to both Lt. McKinley and Lt. Murdter, on General Provision 76(c) and specification section 1400 of the contract and the WESTDIV quality control guide. Testimony indicated that between August 6 and August 22 some discussion with Avedon regarding deficiencies in the plan took place, and supplemental materials were provided by Avedon in response to verbal requests from the ROICC office.

Lt. Murdter's letter of August 22, 1984, outlined in detail the deficiencies in Avedon's CQC plan as amended to that date. The testimony of McKinley and Murdter, along with the court's own review of the documents, show that certain items required by the specifications were deficient or missing completely. General Provision 76(c)(2) requires the quality control organization to be outlined in chart form. Avedon's initial submission did not contain such a chart. A chart was among some supplemental materials submitted by Avedon on August 16; however, this chart showed Mr. Stevenson, Avedon's CQC representative, reporting to Herb Covell of Con Form Quality Control, an outside consultant who does not appear in the final quality control chart. General Provision 76(b) requires that the CQC representative shall report directly to an officer of the contracting firm. Lt. Murdter properly noted this discrepancy in item one of his letter.

There were other deficiencies. General provision 76(c)(7) requires that the CQC plan contain "[a]n inspection schedule keyed to the construction schedule and following the order of the specification technical sections...." Item three of the letter notes this schedule was not included in Avedon's CQC materials. General Provision 76(c)(8) required inclusion of "[t]he procedures for documenting quality control operation, inspection, and testing, *with a copy of all forms and reports to be used for this purpose*" (emphasis added). Item four of the letter notes such forms were not included. Item seven of the letter requests additional detail in the appointment letter of the CQC representative. General Provision 76(c) requires "[a] copy of the letter appointing the CQC representative ... outlining the CQC representatives duties, responsibilities, and authority." The initial submissions by Avedon offered the following as compliant: "All duties, responsibilities, and authority relating to Quality Control for the above project as referenced in the specifications have been assigned to you...." The court finds this letter noncompliant. In addition, the court notes these items required by 76(c) are introduced by the language: "This plan will include as a minimum...." The court thus finds that according to the terms of the contract the ROICC office properly rejected the initial plan as deficient on August 22.

that this event either circumstantially supports its allegations of bad faith or constitutes an independent starting point from which to calculate an unreasonable delay. The court rejects these arguments. First, this incident cannot be said to support the allegations of bad faith, rather it seems to contradict them. If Lt. Murdter or the ROICC office was, in bad faith, delaying the contract, he would not have given the NTP. Furthermore Lt. Murdter's testimony and the IDR's of August 21 and 22, 1984 indicate that the parking lot was not usable after the work pursuant to the false NTP since the asphalt had been almost completely removed. If maintaining the parking lot were truly the reason for delay of CQC approval, there was no reason after the false NTP for the ROICC office to maintain the alleged ruse of demanding substantial compliance with the CQC provisions of the contract. Second, the court fails to see this incident as relevant to the beginning of any unreasonable delay. General Provision 76(c)

clearly states: "Unless specifically authorized by the Contracting Officer *in writing,* no construction will be started until the CQC plan is approved" (emphasis added). No written authorization to proceed was given to Avedon and Avedon's CQC plan had not been approved. The court thus finds no basis for Avedon's reliance on this NTP and no basis for an unreasonable delay claim based on this incident. Even assuming *arguendo* it had a right to rely on the NTP, Avedon would be hard pressed to show the Navy delayed unreasonably *subsequent to the* NTP. The delay time after August 22 attributable to the Navy was only six days from August 31 to September 6. *Cf. Joseph Corman Corp. v. United States,* 246 F.Supp. 602 (D.Mass.1965) (holding a delay of notice to proceed from March 4 to September 26 of the same year was not improper); *Chaney,* 190 Ct.Cl. at 712–13, 421 F.2d at 735 (upholding decision that 45 days was the reasonable portion of a 90–day delay due to a stop-work order).

On August 31, Avedon submitted supplemental CQC materials. The Navy scheduled a CQC conference for September 6, six days later, and the plan was conditionally approved at that time based on Avedon's representation that three remaining deficiencies would be corrected. Thus total review time for the Navy was just over three weeks. Avedon has failed to prove this is an unreasonable amount of time. Nor does the total period of review circumstantially support plaintiff's allegations of bad faith. In fact, if Avedon had submitted its CQC plan as required by the contract on July 5, fifteen days after receipt of award, instead of August 6, and a similar period of review followed, plaintiff would have been able to begin construction shortly after its projected July 30 start date.

In sum, the impression left by the evidence was that the period of the CQC review was wholly reasonable particularly in light of the size of the project and the importance of the CQC plan to its successful completion. Avedon did not meet its burden to show bad faith on the part of the Navy in reviewing the plan. Instead, the court finds the review was in good faith and in accordance with the terms of the contract.

## C. The Vending Alcove Delay Claim

Avedon seeks a $37,329 adjustment and a time extension of 37 calendar days for alleged delay resulting from defects in Government-provided plans and specifications related to placement of a vending machine alcove in the TLF. The relevant facts are recited *supra* at pp. 650 to 651.

As noted, the suspension of work clause allows recovery for increased cost due to unreasonable delay to "all or any part" of the contract. *Chaney* held that all the contractor need show is that part of the contract work was unreasonably delayed. *Chaney* 190 Ct.Cl. at 717, 421 F.2d at 728. Where this is shown, the Government may become liable under the suspension of work clause for increased costs necessarily caused by the unreasonable delay unless concurrent delays not attributable to the government would have equally delayed the contractor's performance. *See Klingensmith*, 731 F.2d at 809; *Blinderman*, 695 F.2d at 559; *Merritt–Chapman & Scott*, 208 Ct.Cl. at 650, 528 F.2d at 1397; *Chaney*, 190 Ct.Cl. at 716, 421 F.2d at 737–38.

Avedon relied primarily on the testimony of Paul Woods to support its vending alcove claim. Mr. Woods described the discrepancy in the contract drawings provided by defendant. The court, based on its own review of the drawings, agrees that they are defective.[7] Drawing A–5A representing the second floor plan of the west wing of the TLF shows a vending alcove located in a hallway in the east end of the building. The wall in that area is inset to allow placement of vending machines. Drawing S–6, which governed structural steel placement showed no inset; rather the wall simply continued without interruption. Woods testified that this problem was discovered as this area was reached by Peck, the structural steel subcontractor. Request for Clarification No. 23 followed on April 10, 1985.

---

7. While not pressing the argument, defendant suggests that if the drawings are ambiguous, then the ambiguity is patent, thus giving rise to a duty on the part of the contractor to inquire. Failure to seek clarification of a patent ambiguity prior to submission of a bid may preclude a contractor from recovering for increased costs resulting from the ambiguity. *See Tilly Constructors & Engineers, Inc. v. United States*, No. 587–85C, slip op. at 13 (Cl.Ct. Sept. 30, 1988) (citing *Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 649 (1982)). The defect was not patent, however. A "patent" ambiguity has been defined as "an obvious omission, inconsistency, or discrepancy," *Beacon Construction Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963), or as an ambiguity "*so* glaring as to raise a duty to inquire." *Newsom*, 230 Ct.Cl. at 304, 676 F.2d at 650 (emphasis in original). In this case the ambiguity involves only a portion of one interior wall on one floor of the building. It is only discernible when this relatively small area is compared on two different sets of drawings, namely the structural steel and architectural plans.

■ The individual daily reports ("IDR's") show that structural steel work on the administration building was underway in early April. This is further supported by Avedon's letter of April 26 regarding the vending alcove to defendant which states that "work *in this area* is at a standstill until we receive an answer" (emphasis added). Defendant offers no evidence to challenge the assertion that structural steel could not be finalized in the alcove area pending resolution of the discrepancy. Indeed, Lt. Herring, the AROICC at that time, testified that as of May 9 he saw decking and roof joists in place over the alcove but they were not secured. Finally, the IDR's for June 4 and 5 of 1985 show Peck welding joists in place at the roof of the administrative building. The court finds that the welding of the roof joists over the alcove and securing of a portion of the roof decking in the administration building were delayed due to the defective specifications.[8] Further, since the delay was due to defective specifications, it is *per se* unreasonable. *Beauchamp*, 14 Cl.Ct. at 438 (citing *Chaney*, 190 Cl.Ct. 699, 421 F.2d 728).

■ The period of such a delay is measured from the discovery of the defect until the contractor is directed how to proceed. *See Beauchamp*, 14 Cl.Ct. at 439 (citing *J.A. Ross & Co. v. United States*, 126 Cl.Ct. 323, 115 F.Supp. 187 (1953)). Avedon offers no other date than that of the request for clarification, thus the court finds the delay began on April 10. Further, the court finds the end of the delay to be May 17. It is clear from both the testimony of Woods and Herring that May 17 was the date upon which Avedon was given oral notice to build a wall in accordance with the structural steel plans.[9] The court thus finds that welding of the roof joists and roof decking in the administration building was unreasonably delayed by the Government from April 10 to May 17.

■ The court finds that although Avedon has shown that the Government caused an unreasonable delay in a portion of the contract work, it has failed for two reasons to show any right to recover damages. First, plaintiff has failed to link delay to any resulting increase in costs. The measure of damages for partial delay has been described as "the degree of interference with satisfactory performance." *Beauchamp*, 14 Cl.Ct. at 439 (citing *La Crosse Garment Mfg. Co. v. United States*, 193 Cl.Ct. 168, 180, 432 F.2d 1377, 1385 (1970)).[10] Plaintiff must therefore show such interference occurred and also has the burden to prove the quantum of damages resulting from this interference. *See Maki v. United States*, 13 Cl.Ct. 779, 781 (1987) (citing *Wunderlich Contracting Co. v. United States*, 173 Cl.Ct. 180, 199, 351 F.2d 956, 968 (1965); *Roberts v. United States*, 174 Cl.Ct. 940, 946, 357 F.2d 938, 949 (1966); *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 737 (1984)) *aff'd*, 852 F.2d 1293 (Fed.Cir.1988). In addition, plaintiff must distinguish the delay or expense allegedly attributable to the Government's unreasonable delay from that attributable to other concurrent causes since "[c]ourts will deny recovery [for unreasonable delay] where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government." *Klingensmith*, 731 F.2d at 809.

Avedon's claim is for 37 days of its entire field and extended home office overhead.

8. The TLF facility consists of three separate elements. The two largest elements are the east wing and west wing, containing the actual lodging units. A smaller unit in the center, referred to here as the administration building houses a reception area and storage units.

9. *See supra* note 2.

10. *Beauchamp* interprets *Chaney* as determining damages by considering the extent and nature of additional work resulting from the defective specifications. *Beauchamp* 14 Cl.Ct. at 439 (cit-

ing *Chaney*, 190 Cl.Ct. at 711, 421 F.2d at 735). Avedon claims no delay resulting directly from any additional work associated with the vending alcove. Further Avedon did not claim it took more time to build the wall than it would have to build the alcove. The court thus finds this standard to be inapplicable. The "interference" standard is more appropriate where Avedon makes its claim in terms of its entire field and home office overhead costs, suggesting total interruption and interference with completion of the contract.

Woods testified that the 37 days consisted of the 27 days from May 9, when Peck left the job site, to June 5, when it returned,[11] plus ten additional days which Woods estimated were "lost," between April 10 and May 9.[12] To recover 100 percent of its overhead, Avedon must prove a virtual shut-down of meaningful work for the equivalent of 37 days between April 10 and June 5.

Woods testified that Peck was doing "piecemeal" work between April 10 and May 9 thus slowing Peck's progress and consequently slowing the progress of another subcontractor, Wyland, who performed framing and bracing. In turn, this slowed Avedon's plywood application, as well as delaying application of roofing materials. As a result Avedon claims it "lost" ten days during this period. These assertions were effectively rebutted by the defendant. The IDR's show that by comparison with the previous month, Peck's standard size crew continued work through May 9. The IDR's show that the average size of Peck's crew when on site was 4 men between March 10 and April 9 and 3.85 men between April 10 and May 9. A review of other periods and the testimony of Lt. Herring regarding manpower used on the project suggest the average size of Peck's crew for the entire contract period was approximately four men per work day. Further, the IDR's offer no support for Woods' assertion that Peck was required to alter the course of its work in a manner that affected overall progress during this period. The IDR's show that after April 10, Peck was placing roof joists and roof steel in place and welding them. This work continued until May 9 when Peck left the job site and moved to the data processing center project. When Peck returned June 5, the IDR's indicate Peck welded the remaining roof joists in place.

Since Peck's full crew continued to work throughout the period in question and no inefficiencies in the manner of performance were shown or are apparent, the court finds no delay to Peck's overall progress on the project during this period despite the fact it could not finalize the roof joists and decking in the alcove area.[13]

In addition, the court finds the delay in welding the roof joists and decking could not have slowed other subcontractors or affected the overall completion date because concurrent delays rendered the delay in the alcove irrelevant. First, the interior wall finishing could not have been delayed by the alcove question. Under Avedon's theory, the failure to finalize the work in the alcove delayed Wyland in its framing and bracing and consequently delayed plywood and wall finishes. However, during the period at issue, Wyland's progress was delayed due to understaffing. Both framing and bracing had to be completed by Wyland before plywood and subsequent wall finishes were applied. Wyland did not even begin bracing until May 2 and bracing was not completed until mid–July. Bracing started on the first floor of the east wing

11. Peck Steel left the job site May 9. The evidence indicates that Peck's crew then began work on the data processing center which was a project that Avedon was building concurrently on Camp Pendleton. The Navy did not order Peck's removal. The parties stipulated that Peck returned to the TLF site on June 5, however, the IDR's show Peck working on the site June 4. The return date is not material to disposition of this case; however, based on the stipulation of the parties, June 5 is treated as Peck's return date.

12. Plaintiff's pretrial materials suggest, and indeed defendant understood from those materials that the 37 day figure was originally calculated from April 10, when the request for clarification was submitted, to May 17, when the Navy ordered Avedon to omit the alcove and build a "double-stud wall" in accordance with the structural steel plans. Plaintiff's letter to defendant of May 8 asking for 16 days of delay would seem to support this view. This earlier delay claim was was based on the preliminary response to the alcove issue by letter of the architect dated April 26, thus suggesting the 16 days were calculated from April 10 to April 26. However, it is clear from plaintiff's post-trial brief that those dates recited by Woods are those asserted by Avedon.

13. The IDR's state that on May 8 and 9, Peck began work on a "trellis" on the roof. Avedon has made no showing that any inefficiency or increased cost resulted from moving to the trellis work and then returning to welding the joists in place if indeed this was out of sequence, which was also not shown.

and had gone no further by May 17. Wyland's slow progress prompted the following notations by the defendant's construction representative in his daily reports. On May 16 he wrote, "Maybe Wyland ... will have to have more personnel because bracing and bridge work are putting them behind." On May 17 he notes that he, "[i]nformed [Avedon's] CQC and Super that the wall bracing and bridging [were] going slower than anticipated. [The Government] would not accept a delay on other subs work because Wyland only [had] 2 welders doing this work." The court thus finds that between April 10 and May 9 Wyland's progress was not delayed by the alcove issue.

Nor was roofing delayed due to the alcove question. First, this aspect of the claim is essentially rendered moot by the court's finding regarding Wyland's delay. The IDR's indicate that roofing was essentially complete in mid–July whereas application of interior wall finishes, which proceeded independently of roofing, was still not complete in late fall. Plywood was still being applied in late October. Thus the court finds a delay in roofing did not cause a consequent delay in overall contract completion since it was completed well before interior wall finishing, progress of which was affected by factors wholly unrelated to any government conduct.[14]

The court similarly finds no delay to overall contract completion during the period from May 9 to June 5 when Peck was off-site. The court will first address the

period from May 9, to May 17 when the vending alcove issue was resolved, a total of six workdays later. Woods testified that Peck left the job-site because it had little remaining work to do absent resolution of the alcove issue. Defendant effectively rebutted this assertion by testimony and cross-examination showing that the bulk of work accomplished by Peck when it returned to the TLF between June 5 and June 19 either could have been done prior to its departure May 9 or was unrelated to the vending alcove area. This work consisted of repair of burn holes, work on stairways, and work on the "mechanical room." Such work was performed by Peck on all ten workdays from June 6 through June 19 according to the IDR's. Furthermore, Peck used an average crew of four men on May 7, 8, and 9 when it left and on June 6, 7, and 10, when it returned.[15] The court finds Peck's departure and any associated delay to Peck's progress during this period were unrelated to any Government conduct.

Nor has Avedon shown any injury due to asserted delay in Peck's progress. Avedon continued to incur home office and field overhead for substantial other work which continued during this period. Moreover, interior wall finishing could not have been affected by Peck's lack of progress during this period because delay in completion of the bracing work was controlling progress. As noted earlier, the bracing work had not progressed beyond the first floor of the east wing of the TLF on May 17.[16]

---

**14.** There was an additional independent, concurrent reason for a portion of any asserted delay to roofing. On April 17, the construction representative's report notes that there were numerous burn holes in the roof steel caused by Peck's welding and on April 18 Peck refused to weld plates over these holes when instructed to do so. Peck's failure to properly proceed with the repair and its affect on roofing are clear from the IDR's of May 8 and 9. On May 8: "Peck steel has not put plates on burn holes." On May 9: "Make sure iron workers plate roof holes prior to retardant spraying. Will accept no delay factor at later date if these items are not completed." The burn hole problem would have delayed roofing in any case during a portion of the period of April 10 through May 9. Plaintiff has failed to offer any analysis of the relation between this delay and the government

caused delay. Woods testified at trial that the burn holes could have been repaired in a couple of hours with a tarlike patching substance. He further testified that the holes were in fact repaired in this manner. The IDR's specifically note, however, the "plating" of burn holes on June 6, 11, and 12, and the IDR for June 19 states that the construction representative "verified plating of holes" in the roof.

**15.** No figure appears for the number of men in Peck's crew on June 4 and 5.

**16.** Similarly as noted above, roofing was not governing contract completion, thus plaintiff's assertion that roofing was delayed during this period is irrelevant to plaintiff's showing of injury.

As to the period from May 17 to June 5, the court finds that since the alcove issue was resolved on May 17, it ceased to be the cause of any delay to Peck's progress during this period.[17] Avedon argues that Peck did not return to the site until June 5 because it was only then that "the job had progressed to a point where Peck could do work on a non-piecemeal basis...." Even assuming *arguendo* that the vending alcove had been the cause of Peck's work being "piecemeal" in nature, the resolution of the issue removed any obstacle it may have presented to continuation of work after May 17 at full capacity. Consequently plaintiff has failed to show any delay of the contract during this period attributable to the Government.

In sum, Avedon has not met its burden of showing meaningful interference with contract work or injury resulting from delay in welding joists and steel in the alcove area. *See Beauchamp,* 14 Cl.Ct. at 437 (citing *Wunderlich,* 173 Ct.Cl. 180, 351 F.2d 956 (1966)). In addition Avedon has failed to distinguish the delay or expense allegedly attributable to the Government's unreasonable delay from that caused by understaffing of the project. *See Klingensmith,* 731 F.2d at 809. As a result Avedon has also failed to establish any quantum of damages with any reasonable accuracy. *See Beauchamp,* 14 Cl.Ct. at 439 (citing *Chaney,* 190 Ct.Cl. at 711, 421 F.2d at 735); *Maki,* 13 Cl.Ct. at 781 (citations omitted).

## D. The Door Switches Delay Claim

■ As noted earlier, each residential unit in the housing facility was to have its own air conditioner, deactivated by a switch when the door was opened. Defendant concedes that the contract was not clear whether the switch was to be mounted inside the metal door frame or on its surface. The relevant background facts are set out at pp. 651 to 652, *supra.*

Avedon contends that work was delayed between April 1 and May 9, 1985 because the door frames were not installed. Avedon argues that the exterior of the front wall of each unit could not be lathed or stuccoed, nor could plywood and sheetrock be installed on the interior walls and ceilings. Avedon contends that completion of the ceiling had as an additional factor the uncertainty concerning whether wiring would be high or low-voltage. High-voltage would require a metal conduit to be placed before installation of plywood. Defendant contends that previously existing concurrent delay factors caused by plaintiff, and not resolved until the same time period, were independent causes for the delay in completing the walls and windows.

There is no question that defendant's handling of the request for clarification and the admitted ambiguity[18] of the drawing caused delay in determining whether the switches should be internally or externally mounted. Door frames were delivered to the work site on February 12, 1985. Installation of the exterior door frames was delayed, at least in part, however, because of concern that an internally mounted switch could not be installed after the frame was in place. When that issue was resolved on May 9, installation of the frames began on May 13 and ended May 30.

The parties have stipulated that the outside wall of each unit could not be lathed or stuccoed until the window frame was installed. Window frames were not ordered by Avedon until May, 1985. The frames were not delivered to the construction site until August 5, 1985. They were certainly not in place in April. Since their late arrival was due to Avedon, not the Government,

17. Plaintiff has not contested the validity of Lt. Herring's oral direction to build a wall in the alcove area in accordance with the structural steel plans. The court thus notes only for the record that such a position would be unsupportable in this case. The Changes Clause of the contract in section (b) clearly provides that an oral order may be considered a change order. Furthermore the evidence shows that Lt. Herring had primary responsibility for dealing with this and similar areas of dispute as demonstrated by the fact he signed the letters clarifying such questions.

18. Defendant has not argued that this ambiguity was so patent as to have required pre-contract clarification.

the delay in lathing and stuccoing the exterior wall was at best due to at least two concurrent causes, one of which was not attributable to the defendant.

An examination of the wall construction and Avedon's own scheduling demonstrates why the remaining work items were not delayed solely because of defendant's tardiness in resolving the door switch problem. Construction of the walls of the building began with placement of metal studs. The contract called for the studs in the three interior walls of a unit to be braced with diagonal metal strips. The exterior wall did not have to be braced. Once a wall was studded, and if necessary, braced, plywood was applied. Gypsum board was then laid over the plywood. Although there is conflict in the testimony as to whether plywood could be applied absent the door frames,[19] the court assumes that Avedon is correct—namely that it would be inefficient to do so, and hence that the plywood should ideally await installation of the frames. This assumption does not assist Avedon, however, because it is clear that as of April 1 and well beyond, Avedon would not have been able to place plywood over the studs because bracing was not in place. The work allegedly delayed was thus dependent[20] on both door frame installation *and* wall bracing.

An examination of the work chronology confirms the error in Avedon's position. Framing on the project began in late January 1985. Bracing began on May 2. Framing and bracing continued into July. Plaintiff does not contend that framing and bracing were dependent on resolution of the door switch problem. Nor is there any explanation in the record for why framing and bracing could not have been substantially[21] completed before May 9, when the door switch problem was resolved. The only explanation for plywood delay supported by the IDR's and the testimony is that the plywood installation did not begin until May 6 because bracing did not begin until May 2. If as of April 1 Avedon had been far enough along with framing and bracing to begin installing door frames, it could now legitimately argue that plywood and sheetrock work was delayed due to defendant's poor handling of the door switches. It is apparent, however, that work had not progressed to that point.

The only work period susceptible to plaintiff's argument is between May 2, when bracing began, and May 9, when defendant finally ordered low-voltage switches. During the intervening four work days the lack of bracing was no longer a factor delaying door frame installation. However, even here Avedon cannot prevail. First, the beginning date for plywood installation was unaffected. Preliminary plywood work began on May 2, and installation began on May 6, both before resolution of the switches question. (May 4 and 5 were not work days.) While it may have been impractical to do large-scale plywood installation on exterior walls prior to resolution of the door switches problem, it is obvious that substantial work was possible. Avedon has not shown any measurable inefficiency due to plywood work done during these few days. Second, the overall amount of time spent on plywood and sheetrocking was unaffected. The exterior door frames were installed by May 31, long before completion of the second prerequisite to plywood installation, bracing, which continued until mid July. In sum, there is no evidence that there was ever a time after bracing began that plywood work was delayed because an insufficient number of door frames were in place.

Defendant offered evidence of what appears to be the real reason bracing and framing were not completed as projected—

---

**19.** There is no explanation for why plywood could not have been installed, at least on the three interior walls of each residential unit as well as common areas, prior to May 9. Plywood installation began May 6, before resolution of the door switch problem.

**20.** In the sense that work could not efficiently continue.

**21.** Paul Woods testified that studs in the exterior wall immediately adjacent to the door frame could not be permanently fixed until the frames were installed. No bracing was done on that wall.

Avedon seriously underestimated the amount of time it would take to do virtually all aspects of the project. Plaintiff anticipated as of December 1, 1984 that all structural steelwork would be completed within 15 days. In fact steelwork through May 9 took approximately 63 days. Framing and bracing were anticipated to take 15 days. By May 9, there had already been 68 days of framing work, only five of which had included any bracing. Bracing continued until July 12. Plywood work, which was projected to take 5 days, in fact was not completed until October 25 (91 days). Sheetrocking was projected to take ten work days; in fact it continued until October 31 (64 days). The delay in beginning plywood and sheetrocking work was not due to ambiguity concerning door switches. Nor has Avedon established that some proportionate amount of the delay in beginning stuccoing, plywood work, or sheetrocking should be assessed against defendant. The court finds that at all times when there was a delay in clarifying the door switch problem, there was a concurrent delay due to lack of bracing. While the confusion caused by incomplete drawings and delayed and conflicting instructions were unfortunate, Avedon has not carried its burden of proving that defendant's conduct or inaction in any way increased Avedon's field and home office overhead or other costs.[22]

## CONCLUSION

Based on the foregoing analysis, Avedon may not recover on any of its claims. The Clerk is directed to dismiss the complaint. No costs.

---

**22.** During trial defendant offered testimony that it properly offset the amount of $4,733 against plaintiff based on decreased costs associated with low-voltage versus high-voltage door switches. Plaintiff has not made a specific claim for recovery of this amount retained by defendant, although the parties agreed in their statement of issues of fact that a trial issue was whether defendant is entitled to a credit or offset, and if so, the amount. The court treats the issue of whether Avedon can recover the offset as one tried by consent. The only evidence offered during trial, however, supported the Government's position that low-voltage switches cost less to install than high-voltage switches. Despite the ambiguity about how the switches were to be installed, the court finds that the drawings clearly reflected high-voltage wiring. Plaintiff offered no evidence to support its claims either that no credit should be allowed, or that the credit was too great. This claim therefore fails for lack of proof.