**CHINA TRADE CENTER, L.L.C., Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., Defendant.**

**No. Civ.A. 98CV0485SS.**

United States District Court, District of Columbia.

Jan. 29, 1999.

M. Roy Goldberg, Geoffrey Paul Gitner, Galland, Kharasch, Morse & Garfinkle, P.C., Washington, DC, William Francis Krebs, Kellogg, Krebs & Moran, Fairfax, VA, for China Trade Center, L.L.C, Alfred H. Liu, plaintiff.

Donald Tiffany Bliss, Jr., Jonathan Lee Griffith, Jessica Davidson Miller, O'Melveny & Myers, L.L.P, Washington, DC, for Washington Metropolitan Area Transit Authority, defendant.

Stuart Scott Morrison, Lynn Estes Calkins, Holland & Knight, L.L.P., Washington, DC, for John Akridge Company, Western Development Corp., Gateway Square Associates, L.L.C., non party.

James Elmer Rocap, III, J. Bradley Bennett, Miller, Cassidy, Larroca & Lewin,

L.L.P., Washington, DC, for Gallery Place Associates, L.L.C., movant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Defendant, Washington Metropolitan Area Transit Authority's ("WMATA"), Motion for Summary Judgment.[1] The following facts are undisputed: WMATA is an interstate agency that was established in 1996 through a congressionally approved interstate compact among the District of Columbia, Maryland, and Virginia. WMATA is charged with the operation of the metrorail and metrobus transportation system in the greater Washington D.C. metropolitan area. Plaintiff, China Trade Center, L.L.C. ("China Trade") is a limited liability company whose principals include individual and corporate developers.

On March 22, 1996 WMATA issued a request for proposals ("RFP") for thirty different properties in the Washington metropolitan area. The RFP indicated the procurement process would be conducted according to WMATA's competitive negotiation procedures whereby WMATA would conduct various rounds of negotiation with each bidder in an attempt to secure the most advantageous Best and Final Offer ("BAFO"). A negotiated procurement procedure differs in significant ways from a sealed bid. Typically, in a sealed bid each proposer has but one opportunity to submit a proposal to the procuring authority. A low or otherwise uncompetitive initial bid necessarily must lose out to a more advantageous one. In a negotiated procurement however, each bidder is encouraged to submit multiple proposals over the course of an ongoing negotiation process. Consistent with these procedures, each bidder submitted multiple proposals to WMATA.

The RFP listed four factors against which WMATA would evaluate each proposal.

These were as follows: (1) the financial viability of the proposed development and developer; (2) the effect of the proposal on WMATA's ridership; (3) the project's ability to create sources of revenue for WMATA; and (4) the effect of the proposal on the local tax base of WMATA jurisdictions. Pursuant to a technical evaluation each proposal was accorded a numerical score signifying the extent to which the proposal fulfilled each factor. WMATA ultimately awarded the project to the proposal that best met its objectives as demonstrated by the final evaluative score.

In addition to satisfying the above factors, all proposals had to comply with certain informational requirements set forth in Part Two of the RFP. These requirements included (1) specific identification of proposed land uses; (2) a site plan; (3) general information on the anticipated impact of the project on Metro transit facilities; (4) sufficient detail so as to enable WMATA to determine whether the proposal would be compatible with local land use policies; and (5) a statement that the developer would ensure that the project will "comply with all applicable local, state and federal, laws and regulations".

One of the properties identified in the RFP was a 1.71 acre lot in Chinatown known as the "Gallery Place Site".[2] WMATA received three timely bids for the Gallery Place Site. The first, from LCOR Inc. ("LCOR"), proposed a mixed-use project consisting of retail and office space. Plaintiff, China Trade, proposed to build a Chinese trade center consisting of office and retail space, condominiums, a cultural/exhibition space and a hotel. Intervener Western Development Corporation ("Western"), initially proposed retail shops and restaurants, most of which had a sports-related theme, and a 2,700 space parking garage.

WMATA conducted an initial technical evaluation of the three proposals in September, 1996. After the initial technical evaluation, the ranking of the three proposals was

---

1. Also pending before the Court is Plaintiff's Motion for additional discovery. Plaintiff's discovery motion is addressed in part IV of this Memorandum Opinion.

2. The Gallery Place site is located next to the Gallery Place Metro station and the recently opened MCI center.

as follows: LCOR received the highest technical score, followed by China Trade and then Western. Following the ranking, WMATA entered into discussions and negotiations with each bidder in order to suggest improvements to each of the three proposals.

WMATA received final BAFO's on September 5, 1997. Western's BAFO consisted of a movie-complex, additional retail space, 120 residential units, two Chinese restaurants and a pedestrian walkway. China Trade's final proposal remained substantially the same.

Following WMATA's final technical evaluation, Western's proposal received the highest score of 810 points. Western's proposal scored high on three of the four evaluation criteria: financial viability; effect on Metro ridership; and ability to increase revenues for WMATA. Specifically, WMATA found Western's proposal would raise $5 Million more in revenue than the other two proposals, would increase metro ridership by 3,400 more riders per day and was backed by solid financing and an experienced development team capable of bringing the project to fruition. On October 24, 1997 WMATA notified Western of its selection as the developer for the Gallery Place Site.

China Trade initiated this action on February 25, 1998. China Trade claims WMATA abused its discretion and violated procurement law in awarding the development project to Western. Specifically, plaintiff makes the following allegations: (1) WMATA violated a material requirement of the RFP that all proposals comply with local land use laws[3]; (2) WMATA violated procurement laws requiring fair treatment of all offerors by exhibiting impermissible favoritism towards Western and bias against China Trade; and (3) WMATA's treatment of China Trade breached an implied contract entered into between WMATA and China Trade whereby WMATA agreed to provide fair and honest consideration to China

Trade's proposal. On October 10, 1998 China Trade filed a motion to extend the discovery period and to allow it to take additional depositions. China Trade's motion was assigned to a Magistrate Judge who, after a hearing, denied plaintiff's request in an Order dated November 20, 1998. Plaintiff moved for reconsideration of the Magistrate Judge's Order on December 12, 1998. On January 26, 1999 this Court held virtually an all day hearing at which time it provided plaintiff the opportunity to expound further on its allegations of bias and favoritism. For the reasons set forth in this opinion, China Trade has not been able to demonstrate successfully any basis for its discovery request or for any of its allegations against the defendant. Accordingly, Defendant's Motion for Summary Judgment will be granted and Plaintiff's request for additional discovery denied.

## ANALYSIS

### I. Standard of Review

 WMATA procurement decisions, like those of administrative agencies, are entitled to a presumption of validity. *Birnberg v. WMATA*, 389 F.Supp. 340, 343 (D.D.C. 1975). A court can not overturn a procurement decision unless it determines the decision has "no rational basis" or "involved a clear and prejudicial violation of applicable statutes or regulations". *Elcon Enters. Inc. v. WMATA*, 977 F.2d 1472, 1478 (D.C.Cir. 1992). In making this determination a court's review ordinarily is limited to "the administrative record already in existence" *Aero Corp. v. United States*, 38 Fed.Cl. 408, 411 (Fed.Cl.1997). In addition, government officials are presumed to act in good faith. *Kalvar Corp., Inc. v. United States*, 211 Ct. Cl. 192, 543 F.2d 1298, 1300 (Cl.Ct.1976). Plaintiff must present "well-nigh irrefragable proof" of bad faith or bias on the part of government officials in order to overcome

---

3. DC's governing land use policies are embodied in its Comprehensive Plan, a project jointly developed by the District of Columbia and the National Capital Planning Commission. The Comprehensive Plan recognizes Chinatown as a distinct cultural area which "should receive special treatment" and sets forth planning policies

to enhance its ethnic character ("the Chinatown Guidelines"). In addition, the D.C. Office of Planning has developed "Chinatown Design Standards" intended to "improve the design quality and enhance the Chinese identity of Chinatown" which also constitute local land use laws.

this presumption. *Haney v. United States,* 230 Ct.Cl. 148, 676 F.2d 584, 586 (Ct.Cl.1982).

## II. WMATA's Decision Did Not Violate Any Procurement Law Or Regulation

The key to China Trade's case is its claim that Western failed to satisfy the RFP requirement that all proposals be compatible with local land use policies.[4] Its proposal should have been selected, plaintiff claims, rather than either LCOR's or Western's, as only its proposal complied with the China-town Guidelines and Chinatown Design Standards. After reviewing carefully each of plaintiff's claims, this Court finds no error in the bidding process. WMATA conducted the process according to its negotiated procurement procedures as required. It treated each bidder equally and considered seriously each proposal. In the end, WMATA opted for the most economically advantageous proposal. This is in accordance with its duties to ensure the economically effective operation of the Metropolitan Area transportation system. WMATA has every right to maximize the economic use of its property. Were this Court to agree with China Trade, plaintiff would ask this Court to set aside WMATA's decision and award the bid to China Trade. This Court can not substitute its judgment for that of WMATA. Its role is to make legal, not business, judgments.

## III. China Trade's Allegations of Bias and Bad Faith Lack Merit.

China Trade's second claim alleges the procurement process was tainted by WMATA's bias and impermissible favoritism in selecting Western's proposal. China Trade's principal allegation in support of this claim stems from the involvement of Alvin McNeal ("McNeal") in the procurement process. McNeal served as WMATA's Manager for Joint Development during the procurement process. Approximately ten years prior to his position with WMATA, McNeal worked as the Executive Assistant to the Director of the D.C. Office of Planning, Fred Greene. In 1996 Fred Greene was a member of Western's proposal team. The relationship between Mr. Greene and Mr. McNeal in 1996 was purely professional in nature.

China Trade contends McNeal exhibited favoritism toward Western's proposal on account of McNeal's prior relationship with Fred Greene. China Trade's "evidence" in support of these accusations are the following: (1) McNeal's failure to disclose to certain WMATA officials his prior relationship with Greene; (2) China Trade's allegation that McNeal failed to investigate sufficiently the so-called "Sharif leak"; (3) China Trade's allegation that McNeal improperly assisted Western in improving its initial offer by engaging in "technical transfusion"[5]; (4) China Trade's allegation that WMATA intentionally failed to recover certain individual scoring sheets used in the procurement process; and (5) the "reweighing" of China Trade's ridership score.

The fact that McNeal worked for Greene nearly a decade ago does not, itself, suggest any bias. Indeed, were plaintiff's argument to be accepted, nearly every member of Washington's professional world could be the target of similar claims. More importantly, even if McNeal did favor Western's proposal, his vote was not determinative. McNeal was but one of a number of WMATA officials charged with evaluating the proposals and making a recommendation to the final deci-

---

4. China Trade bases this conclusion on its reading of the specificity requirement. Plaintiff interprets this provision to require that all proposals must, in fact, be compatible with local land use policies at the time of submission. The nature of WMATA's authority, as well as the specific wording of the RFP, however, do not support plaintiff's view. WMATA has no authority to determine whether or not a proposal complies with local land use regulations or policy objectives. As WMATA indicated to all of the bidders in a March 10, 1997 letter, this determination can be made by the District of Columbia government only, with whom the sole authority to make zoning and other land use determinations rests. WMATA's role in evaluating development projects is, and must be, limited to ascertaining whether or not a proposal *could* comply with the District's land use plans and objectives; not whether it in fact *does*.

5. The term "technical transfusion" refers to the improper appropriation of design aspects of one bidder's proposal by another.

sion-maker. He was not, however, involved in the final decision to award the bid to Western. Moreover, McNeal's failure to disclose to the appropriate WMATA officials his prior professional relationship with Greene during their joint tenure at the D.C. Office of Planning alone can not rebut the good-faith presumption accorded to government officials. *See Haney* at 586. Absent any additional facts demonstrating bias or favoritism, McNeal's prior relationship with Greene, and failure to disclose fully this fact, does not taint the procurement process.

China Trade's second allegation concerning McNeal's alleged favoritism stems from McNeal's investigation into the alleged "Sharif leak". In January 1997, during a confidential presentation by China Trade to WMATA officials, Mostafa Al–Dalghiti Sharif, a developer interested in a property near the Gallery Place Site, testified in favor of the China Trade proposal. A few days later, Mr. Sharif received two telephone calls from persons urging him to withdraw his support for the China Trade proposal. The first caller identified herself as a representative from the Mayor of the District of Columbia's office. The second identified himself as Herbert Miller, then Chairman of Western. Based on this skimpy record, China Trade alleges persons from WMATA present during the January 1997 presentation "leaked" information regarding China Trade's proposal to individuals at Western and the Mayor's office that resulted in the two calls to Mr. Sharif. WMATA assigned McNeal to conduct an investigation into the matter. Mr. McNeal's conclusion, at the close of his investigation, was that no inappropriate conduct occurred.

China Trade characterizes McNeal's investigation as "inadequate". However, the sole ground for China Trade's allegation is the fact that McNeal's investigation did not substantiate China Trade's claim that a leak actually occurred. This kind of result-oriented approach is not the kind of "well-nigh irrefugable proof" required to support a finding of bad faith on the part of a government official. *Id.* On the contrary, the record

demonstrates McNeal conducted a full investigation and made an independent determination that no leak occurred. There is no reason to suppose, other than China Trade's unsupported allegations, that McNeal's investigation was inadequate in any respect. Plaintiff has no other support for its allegations. There is possibly smoke but clearly no fire. Although plaintiff was given the opportunity to pursue this matter in the discovery phase, it chose not to do so.

Third, China Trade alleges McNeal purposely destroyed, or withheld from the administrative record, certain scoring sheets reflecting each evaluator's individual score of the proposals.[6] The absence of these sheets no more supports a negative inference against McNeal than any of China Trade's other allegations. Again, there is nothing in the record to suggest McNeal was responsible in any way for the absence of the scoring sheets.

Fourth, China Trade claims McNeal, or other WMATA officials, disclosed technical information concerning LCOR's and China Trade's initial proposals to Western in an effort to assist Western in acquiring the development award. This "technical transfusion", as China Trade refers to such action, is alleged to be evident in the following aspects of Western's final BAFO: a provision for 120 residential units in lieu of a parking garage and a proposal for a pedestrian walkway lined with Chinese shops linking the Gallery Place Site to the MCI center.

China Trade offers no evidence to support its claim that WMATA officials provided information to Western prior to submission of its final BAFO. It is not wholly surprising that the three plans should share certain similarities in design. The zoning for the Gallery Place Site required a residential component and local land use laws required compatibility with the surrounding architecture and design. Provision for a pedestrian walkway lined with Chinese shops and restaurants should not, therefore, have come as a surprise. China Trade's attempt to dress up these understandable similarities as "technical transfusion" is unpersuasive.

6. While the administrative record contained a number of individual and composite scoring sheets, certain individual scoring sheets were absent.

In its final attempt to convince this Court of WMATA's favoritism, China Trade alleges WMATA "inexplicably reweighed" its ridership score to decrease the total number of metro riders per day associated with its project. This argument is without merit. WMATA informed all proposers that it intended to reweigh initial ridership scores according to a different methodology before the final round of negotiations began. There was nothing unusual, therefore, in WMATA's recalculation of China Trade's ridership score. More importantly, when WMATA reweighed China Trade's ridership score it came up with a final number higher than that proposed by China Trade's initial calculations.[7] Contrary to China Trade's assertions, the reweighing resulted in more favorable ridership numbers than China Trade's own predictions.

### IV. Magistrate Judge's Order

On October 10, 1998 Plaintiff filed a motion for reconsideration of the Magistrate Judge's November 20, 1998 Order denying its request for additional discovery.[8] The Magistrate Judge denied the request, finding China Trade had failed to make the requisite showing of bad faith necessary to warrant discovery beyond the administrative record.[9] In its motion for reconsideration, China Trade alleges the Magistrate Judge misunderstood both the nature of plaintiff's request to take additional depositions and the applicable legal standard.

A court may overturn a Magistrate Judge's findings if "clearly erroneous or contrary to law". Local Rule 503(c). In this case, the plaintiff has had ample opportunity to demonstrate the errors in the Magistrate Judge's Order. At the extensive hearing conducted at plaintiff's request, counsel for China Trade presented its allegations with a broad brush, citing to numerous aspects of the process which he considered indicated bias. However, China Trade's presentation was not supported by the factual record. As a result, there is no basis upon which to reject the Magistrate Judge's finding that China Trade had failed to meet the minimum threshold required for authorizing further discovery.

Although plaintiff has made numerous allegations in support of its claim, the crux of its case boils down to whether Western's proposal complied with the land use criteria established for the site in question. Plaintiff's complaint that Western's proposal does not comply is really for the District of Columbia and the Chinatown Steering Committee to decide. At this time Western's proposal has received no official approval from the city or the Chinatown Steering Committee. There is no reason to believe the city or the Chinatown Steering Committee will not accord plaintiff's "non-compliance claim" serious and appropriate consideration. There is no need for this Court to inject itself into the selection process. Accordingly, Western's motion for summary judgment will be granted and the plaintiff's case will be dismissed.

---

7. WMATA predicted an increase of 2,523 trips per day more than China Trade's own calculations

8. China Trade requested it be allowed to take the depositions of two of Western's principals in order to investigate further its allegations of bias and favoritism.

9. Review of an administrative agency's procurement process in a bid protest case is usually limited to the administrative record. *See Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 7 (D.C.Cir.1998). In this case, the Court allowed plaintiff rather broad discovery, including the opportunity to take seven depositions, of which China Trade only took three.